**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**CONSOLIDATED**

|  |  |  |
|---|---|---|
| TELLUS STRATEGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25-2186 |
| | ) | |
| THE UNITED STATES, | ) | Filed: May 29, 2026 |
| | ) | |
| Defendant, | ) | Re-issued: June 11, 2026* |
| and | ) | |
| | ) | |
| EXACTA SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| and | ) | |
| | ) | |
| COMPASS, INC., | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| and | ) | |
| | ) | |
| INNOVATE NOW, LLC, | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| and | ) | |
| | ) | |
| PROCLEARED, LLC, | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| and | ) | |
| | ) | |

---

*The Court issued this opinion under seal on May 29, 2026, and directed the parties to file any proposed redactions by June 5, 2026. The opinion issued today incorporates the redactions jointly proposed by the parties. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 16). Redacted material is represented by bracketed ellipses "[ . . . ]." The Court did not adopt some proposed redactions by Tellus of information that is already on the public docket.

LOGIC GATE, LLC,                          )
                                          )
                    Defendant-            )
                    Intervenor.           )
_____       )
                                          )
ASSERTIVE PROFESSIONALS, LLC,             )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )        No. 26-93
                                          )
THE UNITED STATES,                        )
                                          )
                    Defendant,            )
and                                       )
                                          )
COMPASS, INC.,                            )
                                          )
                    Defendant-            )
                    Intervenor,           )
and                                       )
                                          )
EXACTA SOLUTIONS, LLC,                    )
                                          )
                    Defendant-            )
                    Intervenor,           )
and                                       )
                                          )
LOGIC GATE, LLC,                          )
                                          )
                    Defendant-            )
                    Intervenor,           )
and                                       )
                                          )
INNOVATE NOW, LLC,                        )
                                          )
                    Defendant-            )
                    Intervenor,           )
and                                       )
                                          )
PROCLEARED, LLC,                          )
                                          )
                    Defendant-            )
                    Intervenor.           )
_____       )

2

**OPINION AND ORDER**

In this post-award bid protest, consolidated plaintiffs Tellus Strategies, LLC ("Tellus") and Assertive Professionals, LLC ("AP") each seek a permanent injunction preventing the National Geospatial-Intelligence Agency ("NGA" or "the Agency") from proceeding with a multiple-award indefinite-delivery indefinite-quantity ("IDIQ") contract for advisory and assistance support services awarded to Defendant-Intervenors Exacta Solutions, LLC ("Exacta"), Compass, Inc. ("Compass"), Innovate Now, LLC ("Innovate Now"), ProCleared, LLC ("ProCleared"), and Logic Gate, LLC ("Logic Gate"). Tellus and AP raise various challenges to NGA's evaluation of proposals under the Relevant Experience, Past Performance, and Risk Assessment factors. For the reasons discussed below, the Court **DENIES** the Motions for Judgment on the Administrative Record filed by Tellus and AP, as well as Tellus's Motion to Supplement the Administrative Record with the Declaration of Sam Burton. Further, the Court **GRANTS** the Cross-Motions for Judgment on the Administrative Record filed by the Government and Defendant-Intervenors. Lastly, the Court **DENIES AS MOOT** the Government's Motion to Dismiss and **GRANTS IN PART AND DENIES IN PART AS MOOT** Exacta's Motion to Dismiss.

## I.    BACKGROUND

### A.    The CLOVER Solicitation

NGA issued Request for Proposals No. HM0476-21-R-0023 ("RFP" or "Solicitation") on December 9, 2021, seeking proposals for a multiple-award IDIQ contract to support the Agency's CLOVER program. *See generally* Admin. R. ("AR") Tab 12.[1] The CLOVER awardees will

---

[1] Unless otherwise noted, the Court's citation to filings in this consolidated matter refer to the *Tellus* docket (No. 25-2186). On January 30, 2026, the Government shared the AR electronically through the Justice Enterprise File Sharing system. *See* ECF No. 53. On February 5, 2026, the Court granted the Government's Motion to Correct the AR to include Tabs 123 and 124. *See* ECF No. 56. On February 17, 2026, the Court granted the Government's Motion to Correct the AR to include Tab 125. *See* ECF No. 59. For ease of reference, citations to the AR

compete for task orders to provide advisory and assistance support services across three Work Service Categories ("WSCs"): (1) Total Lifecycle Acquisition Management, (2) Financial Management, and (3) Strategic Business Management ("SBM").  AR Tab 14a.1 at 1555–62; *see also* AR Tab 17 at 2355–58 (describing services to be provided, including scope of potential task orders).  CLOVER replaces and "redefines the [incumbent] EMERALD program" and will "encompass[] a similar, but not identical, scope."  AR Tab 14a.1 at 1549.

The RFP stated that NGA would make award using a Highest Technically Rated Offerors with a Fair and Reasonable Price ("HTRO") methodology.  AR Tab 17 at 2466.  Offerors were instructed to submit a self-scoring sheet in which they assigned points to their proposals based on the Agency's defined criteria.  *Id.* at 2461–62, 2475.  Upon receiving proposals, NGA would initially conduct an acceptability review and compliance check to ensure proposals satisfied the RFP's requirements.  *Id.* at 2467.  Proposals deemed non-compliant were subject to removal from consideration.  *Id.*  Following the acceptability review and compliance check, evaluators would rank the proposals by self-score.  *Id.*  NGA would then review the five highest self-scored proposals to verify that each self-score was supported by the documentation within the proposal.  *Id.* at 2467.  Where a self-scored evaluation element was unsubstantiated or otherwise not met, the Agency's evaluation team would reduce the offeror's self-score by the appropriate number of points.  *Id.*  The offeror would then be re-ranked based on its revised score.  *Id.*  If the offeror's revised score caused it to fall out of the five highest-rated offerors, then the next highest self-rated offeror would be evaluated.  *Id.*  NGA would repeat this process until there were five verified

---

refer to the bates-labeled page numbers.  Although the Court's rules require the filing of a joint appendix including "those portions of the administrative record that the parties have cited in their respective briefs," Rules of the United States Court of Federal Claims, App. C, ¶ 26, the parties filed only a joint appendix index following the completion of briefing.  *See* ECF No. 106.

highest-rated offerors. *Id.* According to the RFP, the Agency would only assess the price reasonableness of those five proposals. *Id.*

Proposals were due March 29, 2022, and were to be submitted in seven volumes. *Id.* at 2340, 2446. Three such volumes are relevant to these bid protests: Volume 2 – Relevant Experience, Volume 3 – Past Performance, and Volume 6 – Risk Assessment. *Id.*

1.      <u>Relevant Experience</u>

For Volume 2 – Relevant Experience, offerors could self-score up to 27,000 points for demonstrating experience performing work similar to the statement of work ("SOW") for CLOVER. *See id.* at 2468–69; AR Tab 17a at 2622. The Solicitation instructed offerors to submit up to nine projects demonstrating relevant experience performing efforts similar to the three WSCs. AR Tab 17 at 2456. Offerors could only use these nine projects for the remaining evaluation factors. AR Tab 14b at 1698.

The CLOVER SOW included an illustrative list of capabilities for each WSC. *See* AR Tab 14a.1 at 1555–62. The Total Lifecycle Acquisition Management WSC consisted of 17 capabilities. *Id.* at 1555–59. The Financial Management WSC consisted of 10 capabilities. *Id.* at 1559–61. The SBM WSC consisted of eight capabilities. *Id.* at 1561–62. These capabilities are not inclusive of all services NGA may order under the IDIQ. *Id.* at 1555, 1559, 1561. Instead, the capabilities were listed "to provide a generalized understanding of the type of work to be performed." *Id.* at 1555. Offerors were instructed "to provide enough substantiating documentation for the Government to evaluate and assess the technical capabilities contained in each relevant experience example." AR Tab 17 at 2456. The RFP did not limit the amount of supporting documentation an offeror could provide. *Id.* at 2447. NGA used the following scale to assess an offeror's Relevant Experience:

| Scale | Rating | Description |
|-------|--------|-------------|
| 3,000 | Very Relevant | Offeror submission addresses most aspects of the WSC, and convincingly demonstrates that it will meet the Government's performance requirements. |
| 2,000 | Relevant | Offeror submission addresses some aspects of the WSC, and convincingly demonstrates a likelihood of meeting the Government's performance requirements. |
| 1,000 | Minimally Relevant | Offeror submission addresses a few aspects of the WSC, and demonstrates the ability to meet the Government's performance requirements.  The submission may contain several scope inconsistencies. |
| 0 | Not Relevant/Not Submitted | Offeror submission does not address any aspects of the WSC, or no evidence is presented indicating the likelihood of successfully meeting the Government's performance requirements. |

*Id.* at 2469.

2.    Past Performance

As part of Volume 3 – Past Performance, offerors could self-score up to 27,000 points based on the quality of their performance on each project submitted under Volume 2.  AR Tab 17 at 2458–60; AR Tab 17a at 2623–24.  Offerors were instructed to submit a Past Performance package for each project, including an Attachment J.18 form and a Past Performance Questionnaire ("PPQ") completed by the offeror's point of contact ("POC").  AR Tab 17 at 2458–59.  The Solicitation noted that offerors were "responsible for having the POC qualified to speak on representative performance."  *Id.* at 2459.  When reviewing an offeror's Past Performance, the Agency maintained discretion under the RFP to consider information from other sources, including but not limited to: "the Past Performance Information Retrieval System (PPIRS), Federal Awardee Performance and Integrity Information System (FAPIIS), Beta System for Award Management (SAM.gov)[,] [] the Contractor Performance Assessment Reporting System (CPARS)," and "Government customer interviews and questionnaires."  *Id.* at 2471.

6

Under Past Performance, the Agency evaluated offerors based on each Past Performance package submitted according to the following scale:

| Scale | Rating | Description |
|---|---|---|
| 3,000 | Exceptional | 1) Performance met contractual requirements and exceeded many, to the Government's benefit. 2) The contractual performance of the element or sub-element being evaluated was accomplished with no problems or with few minor problems for which corrective actions taken by the contractor were highly effective. |
| 2000 | Very Good | 1) Performance met contractual requirements and exceeded some, to the Government's benefit. 2) The contractual performance of the element or sub-element being evaluated was accomplished with some minor problems for which corrective actions taken by the contractor were effective. |
| 1000 | Satisfactory | 1) Performance met contractual requirements. 2) The contractual performance of the element or sub-element contains some minor problems for which corrective actions taken by the contractor appear or were satisfactory. |
| 500 | Marginal | 1) Performance did not meet some contractual requirements. 2) The contractual performance of the element or sub-element being evaluated reflects a serious problem for which the contractor has not yet identified corrective actions or the contractor's proposed actions appear only marginally effective or were not fully implemented. |
| 500 | Neutral | Any overall WSC Project performance incapable of being evaluated favorably or unfavorably due to the Offeror not having a record of relevant past performance, or for whom information on past performance is not available. |
| 0 | Adverse | Any overall WSC Project performance rating of Unsatisfactory. (Adverse past performance is defined as Unsatisfactory.) |

*Id.* at 2471–72. Both elements of the definition needed to be met for the offeror to receive the corresponding score. *Id.* at 2472.

The PPQs required a separate assessment. Specifically, the Solicitation required the POCs to "corroborate the time frame of performance, customer supported, entity that performed the work, and scope/size/obligated dollars of work performed by Offeror, and customer ratings or

performance information." *Id.* at 2471. The PPQs provided the following ratings for the POCs to assign:

| RATING | DEFINITION |
|---|---|
| OUTSTANDING | ▪ Performance meets contractual requirements and exceeds many to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective.<br>▪ To justify an Exceptional rating, identify multiple significant events and state how they were of benefit to the Government. A singular benefit, however, could be of such magnitude that it alone constitutes an Exceptional rating. Also, there should have been NO significant weaknesses identified. |
| VERY GOOD | ▪ Performance meets contractual requirements and exceeds some to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with some minor problems for which corrective actions taken by the contractor were effective.<br>▪ To justify a Very Good rating, identify a significant event and state how it was a benefit to the Government. There should have been no significant weaknesses identified. |
| ACCEPTABLE | ▪ Performance meets contractual requirements. The contractual performance of the element or sub-element contains some minor problems for which corrective actions taken by the contractor appear or were satisfactory.<br>▪ To justify a Satisfactory rating, there should have been only minor problems, or major problems the contractor recovered from without impact to the contract/order. There should have been NO significant weaknesses identified. |
| MARGINAL | ▪ Performance does not meet some contractual requirements. The contractual performance of the element or sub-element being evaluated reflects a serious problem for which the contractor has not yet identified corrective actions. The contractor's proposed actions appear only marginally effective or were not fully implemented.<br>▪ To justify Marginal performance, identify a significant event in each category that the contractor had trouble overcoming and state how it impacted the Government. A Marginal rating should be supported by referencing the management tool that notified the contractor of the contractual deficiency (e.g., management, quality, safety, or environmental deficiency report or letter). |
| UNACCEPTABLE | ▪ Performance does not meet most contractual requirements and recovery is not likely in a timely manner. The contractual performance of the element or sub-element contains a serious problem(s) for which the contractor's corrective actions appear or were ineffective.<br>▪ To justify an Unsatisfactory rating, identify multiple significant events in each category that the contractor had trouble overcoming and state how it impacted the Government. A singular problem, however, could be of such serious magnitude that it alone constitutes an unsatisfactory rating. An Unsatisfactory rating should be supported by referencing the management tools used to notify the contractor of the contractual deficiencies (e.g., management, quality, safety, or environmental deficiency reports, or letters). |
| NEUTRAL | ▪ No past performance information is available, or in your position, you were not able to observe and assess the contractor's performance for this function. |

AR Tab 16a.3 at 2321.

    3.    Risk Assessment

For Volume 6 – Risk Assessment, under the Organizational Structure subfactor, offerors could self-score additional points by demonstrating previous performance with their subcontractors or joint venture members in the proposed business arrangement. AR Tab 17 at 2475–76. The Solicitation instructed each offeror to "identify if it has previously performed in a business arrangement with their proposed subcontractors or JV partners." *Id.* at 2463. The Solicitation defined "Previously Performed" as "performance that took place before the issuance

of the CLOVER solicitation, for a period of no less than one complete Period of Performance on another contract action, or for a period totaling one calendar year." *Id.*

To earn a score of 2,000 points under Risk Assessment – Organizational Structure, the RFP instructed joint venture offerors to submit a J.17 Self-Scoring Sheet reflecting that the offeror "has previously performed with greater than or equal to 60% of all Partners and proposed subcontractors under previous agreements/contracts." AR Tab 17a at 2625. Non-joint venture offerors could earn a score of 2,000 points by indicating that the offeror "has previously performed with greater than or equal to 60% of all subcontractors under previous agreements/contracts." *Id.* To verify the submission, offerors were required to include: (1) "[t]he contract or Task Order for which the work was performed," and (2) "[e]vidence of the business arrangement," *e.g.*, "[a] [j]oint venture agreement that identifies all members, or [a] copy of the subcontract(s)." AR Tab 17 at 2464. If the offeror previously performed with less than 60 percent of all partners and proposed subcontractors, the offeror was only entitled to 1,000 points. AR Tab 17a at 2625.

The Solicitation stated in bold and centered text that "**[i]t is the responsibility of the Offeror to ensure that any supporting documentation clearly represents the working partnership on the previously performed work**." AR Tab 17 at 2464 (emphasis in original). The RFP also indicated, in describing the evaluation methodology for Risk Assessment – Organizational Structure, that "[s]coring for this element is only available for demonstrating that the Offeror has previously performed in the proposed business arrangement." *Id.* at 2475. Thus, "Offerors who have worked with their partners or subcontractors before are considered more favorable in accordance with [the J.17 Self-Scoring Sheet]." *Id.* at 2475–76.

### B.    Tellus's Proposal

Tellus is a mentor-protégé joint venture between McIntire Solutions, LLC ("McIntire") and S2 Analytical Solutions, LLC ("S2"). AR Tab 30a.6 at 31482. It submitted its proposal on March

29, 2022, and included the maximum nine projects for the Relevant Experience and Past Performance factors.  *See* AR Tab 30a.1 at 31746; AR Tab 30a.3 at 31773, 31777.  For the Total Lifecycle Acquisition Management WSC, Tellus submitted three projects: (1) Project 1-1 ([ . . . ]), (2) Project 1-2 ([ . . . ]), and (3) Project 1-3 ([ . . . ]).  AR Tab 30a.3 at 31773.  For the Financial Management WSC, Tellus submitted three projects: (1) Project 2-1 ([ . . . ]), (2) Project 2-2 ([ . . . ]), and (3) Project 2-3 ([ . . . ]).  *Id.*  For the SBM WSC, Tellus submitted three projects: (1) Project 3-1 ([ . . . ]), (2) Project 3-2 ([ . . . ]), and (3) Project 3-3 ([ . . . ]).  *Id.*  Under the Risk Assessment – Organizational Structure factor, Tellus self-scored 2,000 points based on it having previously performed with greater than or equal to 60 percent of all partners and proposed subcontractors.  AR Tab 30e.1.  In support of this score, Tellus submitted eight subcontract modifications, with two subcontract modifications demonstrating the relationship between [ . . . ] and [ . . . ], and the remaining subcontract modifications demonstrating the relationship between [ . . . ] and six of Tellus's proposed subcontractors.  AR Tab 30f.2 at 36071.  Overall, Tellus scored its proposal as receiving 72,750 points out of a possible 78,500 points.  AR Tab 30e.1.

### C.  AP's Proposal

AP also submitted a timely proposal.  AR Tab 112 at 45650.  Three of AP's projects are relevant to its protest: (1) Project 1-2, which involved AP's subcontractor [ . . . ]'s performance of Program Management Support Services for the [ . . . ], AR Tab 21b.27 at 3195; (2) Project 2-2, which involved AP's subcontractor [ . . . ]'s performance of Business Operations services for the [ . . . ], AR Tab 21b.34 at 3382; and (3) Project 3-2, which involved the same contract as Project 2-2, AR Tab 21b.36 at 3387.  Under the Risk Assessment – Organizational Structure factor, AP self-scored 2,000 points based on it having previously performed with at least 60 percent of its proposed subcontractors.  AR Tab 21e.4.  In support of this score, AP submitted two documents: (1) a unilateral modification exercising an option year under an IDIQ subcontract between AP and

10

[ . . . ], AR Tab 21f.8; and (2) a bilateral modification exercising an option year under an IDIQ subcontract between AP and [ . . . ], AR Tab 21f.9.[2]  Overall, AP self-scored 73,750 points out of 78,500 possible points.  AR Tab 21e.4.

### D.   The Initial Award Decision, Protests, and 2025 Re-Evaluation

On May 23, 2023, NGA announced its original awards to Compass, Credence Dynamo Solutions, LLC, Exacta, Innovate Now, and Logic Gate.  *See* AR Tabs 45a–45e.  Tellus and AP both requested and received post-award debriefings on June 16, 2023, during which the Agency provided each plaintiff with a redacted version of the Source Selection Decision Document ("SSDD"), a redacted and excerpted version of the Source Selection Evaluation Board ("SSEB") Report, and copies of their respective Consensus Evaluation Reports ("CERs").  *See* AR Tabs 49a, 49b.

Three unsuccessful offerors subsequently filed protests at the Government Accountability Office ("GAO"): AP, Zolon PCS II, LLC ("Zolon"), and ProCleared.  *See* AR Tabs 52, 57, 66.  Tellus did not file a protest or otherwise object to the procurement at that time.  In July 2023, NGA took voluntary corrective action including re-evaluation of proposals.  AR Tabs 53, 59, 67.  Zolon challenged NGA's proposed corrective action in this Court on August 24, 2023.  *See Zolon PCS II, LLC v. United States* (*Zolon I*), 172 Fed. Cl. 742 (2024).  On January 8, 2025, Zolon filed a subsequent protest of the Agency's decision to incorporate into the RFP a revised version of Federal Acquisition Regulation ("FAR") 52.204-7.  *See Zolon PCS II, LLC v. United States* (*Zolon II*), 176 Fed. Cl. 279 (2025).  The merits of Zolon's previous protests are not relevant to Tellus's and AP's current challenges.

---

[2] AP and [ . . . ] both proposed [ . . . ] as a subcontractor.  *See* AR Tab 21a.3 at 2649; AR Tab 28a.2 at 2436–37.  [ . . . ] was also proposed as a member of Exacta, a mentor-protégé joint venture.  *See* AR Tab 25a.1 at 16714.

Following resolution of Zolon's second protest before this Court, NGA completed its re-evaluation of the remaining offerors. *See* AR Tab 112 at 45649–52. On September 8, 2025, based on the re-evaluation, the Agency notified offerors of its new decision to issue awards to Compass, ProCleared, InnovateNow, Logic Gate, and Exacta. *See* AR Tabs 115a–116b. As part of the debriefing process, Tellus and AP were provided with redacted copies of the new SSDD, SSEB report, and CERs. *See* AR Tabs 119a.1, 119b.1.

During the re-evaluation, NGA validated 57,250 of Tellus's 72,750 claimed points. *See* AR Tab 112 at 45737. Specifically, the evaluators reduced Tellus's self-scores for the Relevant Experience, Past Performance, and Risk Assessment – Organizational Structure factors. *Id.* Tellus initially filed an agency-level protest on September 22, 2025, AR Tab 121, which NGA denied on December 1, 2025, AR Tab 122. The re-evaluation also resulted in the Agency verifying 68,750 of AP's 73,750 self-score points. AR Tab 112 at 45688. Specifically, NGA reduced AP's self-scores for the Relevant Experience, Past Performance, and Risk Assessment – Organizational Structure factors. *Id.* at 45689–94. AP initially filed a protest at GAO, which was dismissed under 4 C.F.R. § 21.11(b) after Tellus filed its protest in this Court.

### E.     Procedural History

On December 30, 2025, Tellus filed its Complaint. *See* ECF No. 1. Following dismissal of its GAO protest, AP filed its Complaint on January 16, 2026. *See Assertive Pros.*, No. 26-93, ECF No. 1. All five awardees intervened. *See* ECF Nos. 11–13, 20, 22, 24, 26–27. The Court subsequently consolidated the cases, designating *Tellus*, No. 25-2186, as the lead case. *See* Consolidation Order, ECF No. 39.

Tellus filed a Motion to Complete and Supplement the Administrative Record, Order Depositions, and Temporarily Suspend Briefing on February 23, 2026. ECF No. 61. In its motion, Tellus sought to: (1) complete the AR with all documents prepared by the members of the relevant

12

evaluation teams in connection with the preparation of their CERs, as well as the Performance Assessment Reports ("PARs") that the POC reviewed in completing PPQs for three of Tellus's projects, *id.* at 2–3; (2) supplement the AR with the Declaration of Sam Burton, [ . . . ] of [ . . . ] (the "Burton Declaration"), as well as the transcripts of the as-yet taken depositions of the chairs of the relevant evaluation teams, *id.* at 3–6; (3) have the Court order such depositions, *id.* at 6–7; and (4) suspend briefing "until such time as the AR is completed and supplemented and the depositions occur," *id.* at 7.  On March 9, 2026, the Government and Defendant-Intervenors Logic Gate, ProCleared, Innovate Now, and Exacta filed oppositions to Tellus's motion.  *See* ECF Nos. 74 (Logic Gate), 78 (Government), 80 (ProCleared), 82 (Innovate Now), 85 (Exacta).  Following oral argument on March 12, 2026, the Court denied Tellus's motion, except that it deferred ruling on whether to supplement the record with the Burton Declaration.  ECF No. 87.

On the same day that Tellus filed its request for completion and supplementation, both Tellus and AP filed their Motions for Judgment on the Administrative Record.  ECF Nos. 62 (Tellus), 64 (AP).  In their motions, each plaintiff brings various challenges to the Agency's evaluation under the Relevant Experience, Past Performance, and Risk Assessment factors.  On March 9, 2026, the Government and Exacta filed Motions to Dismiss and Cross-Motions for Judgment on the Administrative Record.  ECF Nos. 79 (Government), 86 (Exacta).  That same day, the remaining Defendant-Intervenors also filed Cross-Motions for Judgment on the Administrative Record.  ECF Nos. 72 (Compass), 73 (Logic Gate), 81 (ProCleared), 83–84 (Innovate Now).  On March 20, 2026, Tellus and AP each filed their combined response to the Government's and Defendant-Intervenors' motions and reply in support of their motions.  ECF Nos. 93 (AP), 94 (Tellus).  The Government and Defendant-Intervenors each subsequently filed their combined responses and replies.  ECF Nos. 96 (Compass), 98 (Logic Gate), 101 (ProCleared), 102 (Government), 103–04 (Innovate Now), 105 (Exacta).  The Court heard oral argument on the

parties' dispositive motions on April 17, 2026. All motions are now fully briefed and ripe for disposition.

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6) Motions to Dismiss

Under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), an action may be dismissed if it fails to state a claim for which relief may be granted. "A motion to dismiss pursuant to Rule 12(b)(6) tests whether 'the facts asserted by the claimant . . . entitle [plaintiff] to a legal remedy.'" *Flynn v. United States*, 180 Fed. Cl. 256, 260 (2026) (alteration in original) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)). To avoid dismissal under RCFC 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a complaint need not contain detailed factual allegations to raise a plausible claim, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (holding that courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

In deciding a motion under RCFC 12(b)(6), the Court may consider the complaint itself, "the written instruments attached to it as exhibits, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Todd Constr., L.P. v. United States*, 94 Fed. Cl. 100, 114 (2010) (quoting *Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 322 (2007)), *aff'd*, 656 F.3d 1306 (Fed. Cir. 2011). The Court must draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).

14

### B.    Motions to Complete or Supplement the Administrative Record

"Different standards govern motions to complete and motions to supplement the administrative record." *ELB Servs., LLC v. United States*, 172 Fed. Cl. 233, 241 (2024).  A motion to complete the administrative record seeks to add documents to the record that were generated or considered by the relevant decision-maker but not included in the administrative record.  *Poplar Point RBBR, LLC v. United States* (*Poplar Point I*), 145 Fed. Cl. 489, 494 (2019).  Because the Government's "designation of an administrative record is entitled to a presumption of completeness," to prevail on a motion to complete, a plaintiff must provide "clear evidence" that the administrative record lacks information that was "generated or considered by the agency during the procurement and decisionmaking process."  *Id.*; *see also Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1238–39 (Fed. Cir. 2002) (explaining that courts presume government officials exercise their duties in good faith).

A motion to supplement the administrative record, on the other hand, seeks to add materials that were not considered by the agency in reaching its decision but are nevertheless necessary to permit the Court's full evaluation of the agency's decision.  *Poplar Point I*, 145 Fed. Cl. at 494.  To supplement the record, a plaintiff must make a higher showing than that necessary to prevail on a motion to complete.  *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (explaining that parties have a "limited" ability to supplement the administrative record).  This is because, in a case applying the Administrative Procedure Act's ("APA") standard of review, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Id.* (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  Thus, the administrative record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA."  *Id.* at 1381.

15

Courts have found supplementation appropriate where the supplemental material is "necessary to help explain an agency's decision," *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 & n.10 (2004) (citing *Camp*, 411 U.S. at 142–43); helps explain what the agency considered in reaching a decision, *Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 747 (2006), *aff'd*, 228 F. App'x 980 (Fed. Cir. 2007); or otherwise "correct[s] mistakes and fill[s] gaps" in the record, *Pinnacle Sols., Inc. v. United States*, 137 Fed. Cl. 118, 130 (2018).  Supplementation is also generally appropriate when the extra-record material contains "relevant information that by its very nature would not be found in an agency record[,]" including "evidence of bad faith." *Orion*, 60 Fed. Cl. at 343–44.

### C.      Motions for Judgment on the Administrative Record

RCFC 52.1(c) governs motions for judgment on the administrative record.  Such motions essentially call for "an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  Unlike the standard for summary judgment, the standard for judgment on the administrative record involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged agency decision] was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine dispute of material fact does not prevent a court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357; *Martinez*, 77 Fed. Cl. at 324.

### D.      Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, confers on this Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  The Act requires this Court to

review the agency's action "pursuant to the standards set forth" in the APA. *Id.* § 1491(b)(4); *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (explaining that this Court reviews bid protests under the APA's arbitrary and capricious standard). Accordingly, the Court asks whether a procuring agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To prevail, a protester "must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). Under the APA standard, an agency action "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Procurement officials "are given broad discretion" in their procurement duties; when a procurement officer makes a reasonable decision within the scope of that discretion, "a court may not substitute its judgment for that of the agency." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)). Thus, a protester "bears a heavy burden" to overcome the presumption of regularity courts afford to an agency decision. *Impresa*, 238 F.3d at 1338. If the "agency provided a coherent and reasonable explanation of its exercise of discretion," the agency action should be sustained. *Id.* at 1333 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).

### III.  DISCUSSION

This opinion proceeds in five parts. First, the Court finds that Tellus has not demonstrated prejudicial error in the Agency's evaluation of its proposal. Second, the Court further explains its

17

previous decision denying Tellus's Motion to Complete and Supplement the Administrative Record, Order Depositions, and Temporarily Suspend Briefing, and it denies Tellus's Motion to Supplement the AR with the Burton Declaration because it is not necessary for effective judicial review. Third, the Court determines that AP has not established prejudicial error in NGA's evaluation process. Fourth, the Court finds that neither plaintiff has established that the Agency's HTRO determination and resulting award decision were unreasonable. Finally, the Court concludes that neither plaintiff is entitled to permanent injunctive relief.

### A.    Tellus Has Not Succeeded in Its Protest.

Tellus challenges the Agency's evaluation of Tellus's proposal under the Relevant Experience, Past Performance, and Risk Assessment – Organizational Structure factors. *See* ECF No. 62 at 19–44. Tellus also argues that the Agency failed to conduct a meaningful re-evaluation of Tellus's proposal. *Id.* at 16–19. Upon review, the Court determines that Tellus has not demonstrated any prejudicial error in NGA's evaluation, nor has it demonstrated that the Agency failed to conduct a meaningful re-evaluation.

### 1.    The Agency Rationally Evaluated Tellus's Relevant Experience.

Tellus claims that the Agency failed to rationally evaluate Tellus's Relevant Experience volume because (1) Tellus was entitled to a Very Relevant rating for each project that demonstrated at least some relevant experience for greater than 50 percent of the WSC elements; (2) the Agency understated Tellus's Relevant Experience and its ability to meet NGA's requirements; and (3) the Agency engaged in disparate treatment when evaluating Tellus's Relevant Experience. None of these claims have merit.

18

> a.    The RFP did not require the Agency to give Tellus a Very Relevant rating for each project that demonstrated at least some Relevant Experience for greater than 50 percent of the elements listed under the WSC.

Tellus claims that "NGA failed to reasonably evaluate Tellus's Relevant Experience" with respect to four projects: (1) Project 1-3 ([ . . . ]); (2) Project 2-1 ([ . . . ]); (3) Project 3-1 ([ . . . ]); and (4) Project 3-3 ([ . . . ]). *Id.* at 19 (citing AR Tab 107a at 45301–45). According to Tellus, because the Relevant Experience Evaluation Team ("REET") "found that all Tellus's projects reflected either 'very relevant experience' or 'some relevant experience' with respect to at least 50% of the elements comprising each WSC," these projects were each entitled to a Very Relevant rating. *Id.* at 20.

Under the Solicitation, a Relevant Experience submission (*i.e.*, a project) would receive a "Very Relevant" rating and 3,000 points if it "addresse[d] most aspects of the WSC, and convincingly demonstrate[d] that [the offeror] will meet the Government's performance requirements." AR Tab 17 at 2469. A submission would instead receive a "Relevant" rating and 2,000 points if it "addresse[d] some aspects of the WSC, and convincingly demonstrate[d] a likelihood of meeting the Government's performance requirements." *Id.*

Tellus and the Government disagree as to the proper interpretation of this scoring methodology, specifically disputing the meaning of "addresses most aspects of the WSC." In Tellus's view, the question of whether an offeror should receive a Very Relevant rating "is largely a mathematical one of: (1) how many 'aspects' there are to each WSC and (2) based on a reasonable evaluation, whether a Project 'addresses' more than half." ECF No. 94 at 13. Tellus argues that the "aspects of the WSC" are the non-exclusive list of "capabilities" enumerated in the SOW for each WSC, which Tellus also refers to as the "elements" of a WSC.[3] *See id.* at 21–22;

_____

[3] For ease of reference, in this section the Court mirrors Tellus's use of the term "element" when referring to these "capabilities."

*see also, e.g.*, AR Tab 14a.1 at 1555 (introducing the capabilities for the Total Lifecycle Acquisition Management WSC and stating that they "provide a generalized understanding of the type of work to be performed"). Tellus also takes the view that a WSC aspect is "addressed" if NGA made at least one finding of "some relevant experience" with regard to that WSC aspect. ECF No. 62 at 20–22. The Government disagrees with Tellus's interpretation of the Solicitation, arguing that the Agency had greater discretion to weigh its findings and assign an overall rating. *See* ECF No. 79 at 50–52; ECF No. 102 at 19–23. The Court agrees.

As an initial matter, the United States Court of Appeals for the Federal Circuit has rejected similar attempts by disappointed offerors challenging adjectival ratings to transform a procuring agency's evaluative judgment into a formulaic calculation. In *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901 (Fed. Cir. 2013), the Circuit emphasized that past performance adjectival ratings are "not subject to a mathematical calculation," and thus it is incorrect to argue that overall and subfactor ratings can "be added up and 'averaged out' to score the contractor." *Id.* at 909 n.6; *see also AccelGov, LLC v. United States*, 180 Fed. Cl. 385, 394–95 (2026) (an agency does not need to treat adjectival findings as "mathematical pluses and minuses" (citing *Glenn Def. Marine*, 720 F.3d at 909 n.6)); *Am. Relocation Connections, LLC v. United States*, 147 Fed. Cl. 608, 619 (2020) (agencies have the "discretion to make a best value judgment concerning the proposals' technical advantages, and that judgment necessarily involve[s] considering the magnitude of the strengths, not just the quantity of strengths" (citing *Glenn Def. Marine*, 720 F.3d at 909 n.6)), *appeal dismissed*, No. 2020-1717, 2020 WL 13660147 (Fed. Cir. Apr. 27, 2020).

Moreover, in arguing for a mathematical interpretation, Tellus attempts to distort the Agency's adjectival ratings in a manner that leads to illogical results. To understand why, it is important to better understand how the Solicitation approached the evaluation of an offeror's Relevant Experience. First, Tellus is incorrect to say that the WSC "aspects" referenced by the

20

adjectival rating scale are co-extensive with the "capabilities" listed under each WSC. *See* AR Tab 17 at 2469 (describing a Very Relevant submission as, in part, one that "addresses most *aspects* of the WSC" (emphasis added)). When responding to questions from potential offerors, the Agency specifically stated that "aspect" should be defined according to its common usage. AR Tab 14b at 1715. Thus, as the Government aptly argues, "an aspect of a WSC is simply a part of that WSC." ECF No. 102 at 23 (citing *Aspect*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/aspect). The capabilities (*i.e.*, elements) listed under each WSC also contained various tasks or expectations, which the Solicitation explicitly stated were non-exclusive of the work to be performed pursuant to that WSC. *See, e.g.*, AR Tab 14a.1 at 1555. Accordingly, the Solicitation did not plainly contemplate a mathematical counting of a WSC's listed capabilities.[4]

Additionally, while "most" lends itself to an interpretation of greater than 50 percent, *see* Apr. 17, 2026 Oral Arg. Tr. at 25:13–14, ECF No. 108, the Solicitation does not require Tellus's strict application of the term. When asked to quantitatively define the term "some" in relation to the Relevant Experience rating scale, NGA refused, instead stating that "some is less than most" but "greater than few" and emphasizing that "[e]valuators will exercise their discretion to assess relevance." AR Tab 14b at 1715 (cleaned up). This further demonstrates the Agency's reluctance to cabin its analysis to a mathematical approach such as the one suggested by Tellus.

Indeed, the Solicitation's allowance for discretion appears particularly sensible when taking Tellus's mathematical argument to its logical conclusion. As previously discussed, each

---

[4] Admittedly, in evaluating Tellus's proposal, NGA only analyzed whether Tellus addressed the listed capabilities of each WSC. *See generally* AR Tab 107a. Even so, the fact that the Solicitation gave the Agency discretion to consider additional aspects beyond what was explicitly described as a non-exclusive list of capabilities indicates that the Solicitation intended for the Agency's discretion to play a significant role in determining an offeror's overall rating.

WSC was comprised of a number of capabilities (or elements) that themselves contained various tasks or expectations.  For example, under the Total Lifecycle Acquisition Management WSC, there were 17 elements, the first of which was Acquisition Management Support.  *See* AR Tab 14a.1 at 1555.  Under that element, awardees may be required to:

> Provide advice to the Government in complying with the Federal Acquisition Regulation and supplements from the [Department of Defense (DoD)], [Intelligence Community (IC)], and Agency.  Develop policies and procedures for standardizing and expediting NGA acquisitions.  Communicate and market acquisition policy and efforts to internal and external customers.  Assess current contracts, along with acquisition trends from other agencies' software development and commercial off-the-shelf (COTS) integration contracts, to identify opportunities for implementing acquisition reform principles.  Manage and advise the requirements identification and documentation process.

*Id.*  Using Tellus's interpretation of the Solicitation, if an offeror demonstrated at least some experience with "[p]rovid[ing] advice to the Government in complying with the Federal Acquisition Regulation and supplements from the DoD, IC, and Agency," then the offeror successfully "addressed" the entire Acquisition Management Support element, even if the offeror demonstrated minimal or no experience with the remaining tasks/expectations.  Thus, if the offeror ultimately demonstrated *at least some* experience with *at least one* of the tasks/expectations for *just over half* of the elements, the offeror would be entitled to an overall rating of Very Relevant.  This would remain true even if other offerors demonstrated *very relevant* experience for *all* of the tasks/expectations for *every* WSC element; the two offerors would be entitled to the same overall Very Relevant rating.  This is not a reasonable interpretation of the Solicitation.  *See* ECF No. 102 at 21–23; ECF No. 108 at 88:14–90:4.  The only reasonable interpretation is the one put forth by the Government—that the Agency retained discretion to take a more nuanced evaluative approach.  *See* ECF No. 102 at 23 (arguing that under the Solicitation, "the determination of whether a project demonstrates relevant experience with most, some, few, or not any aspects of a WSC is left to the evaluator's discretion").

Allowing room for discretion in determining the first component of the Very Relevant rating definition also gives meaning to the second component—that the offeror "convincingly demonstrate[] that it will meet the Government's performance requirements." AR Tab 17 at 2469. As argued by the Government, Tellus's mathematical approach would seemingly render this language superfluous: if the offeror demonstrated at least some experience with just over 50 percent of the WSC elements, it was entitled to a Very Relevant rating, with no separate consideration of whether the offeror convincingly demonstrated that it will meet the Agency's requirements.[5] *See* ECF No. 102 at 20–21. The Court declines to adopt Tellus's interpretation and thus relegate the second component of a Very Relevant rating to insignificance. *See Banknote*, 365 F.3d at 1353 (stating that courts "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions").

In sum, considering the Agency's decision to use adjectival ratings, the Solicitation's emphasis on the Agency's discretion, and the illogical results that would occur using Tellus's mathematical approach, the Court rejects Tellus's reading of the Solicitation. The Agency did not act irrationally in choosing not to award each of Tellus's projects a Very Relevant overall rating simply because Tellus demonstrated some experience with greater than 50 percent of the applicable WSC capabilities.[6]

---

[5] Tellus seems to argue that, if a project addresses most aspects of the WSC, it also demonstrates an ability to meet the Agency's performance requirements. *See* ECF No. 62 at 20 (stating that because "all Tellus's projects reflected either 'very relevant experience' or 'some relevant experience' with respect to at least 50% of the elements comprising each WSC," Tellus's proposal also "consistently demonstrated the ability to meet the Government's performance requirements"). But this fails to address the issue of superfluousness, as it merely melds the two standards into one test.

[6] At oral argument, Tellus argued that the Agency failed to "explain how it arrived at its ratings." ECF No. 108 at 23:5–12 (contending that "[t]he evaluation report contains findings for each element of a work service category, but never explains how the findings warrant the rating assigned for the project"). Tellus claims that its interpretation of the Solicitation "steps into that

  b.  *Tellus's objections to the Agency's analysis of its Relevant Experience constitute mere disagreement with the Agency's reasonable evaluation.*

Tellus also takes issue with the Relevant Experience ratings assigned by the Agency for Projects 3-1 and 3-3, claiming that the Agency "understate[d] the . . . projects' relevant experience and Tellus's ability to meet NGA's requirements." ECF No. 62 at 20. Specifically, Tellus argues that "NGA ignored details showing that Tellus's members performed the very WSC elements NGA claimed were missing." *Id.*

"Tellus submitted Project 3-1, performed by [ . . . ], to show its relevant strategic business experience." *Id.* at 24. When evaluating Project 3-1, NGA determined that Tellus demonstrated very relevant experience with regard to four of the eight elements. *Id.* Tellus claims that the Agency acted unreasonably in failing to credit it with experience addressing one additional element—Continuity of Operations ("COOP"). *Id.* The Solicitation listed the following responsibilities as comprising the COOP element: "Conduct technical assessments of current and future DoD and IC efforts for COOP to determine the impact on the [National System for Geospatial Intelligence ("NSG")]. Assist with review and evaluation of strategic direction for systems to participate in COOP architectures." AR Tab 14.a.l at 1562.

According to Tellus, Project 3-1 demonstrated experience with COOP services because (1) "[ . . . ]'s efforts under Project 3-1 covered the entire acquisition lifecycle," ECF No. 62 at 25; (2) "[ . . . ] supported tasks 'designed to provide a *technical and strategic framework to enable sound decisions* relating to system performance, risk, cost, and schedule,'" *id.* (emphasis in

---

void to explain how the findings would logically translate to ratings." *Id.* at 23:13–14. Nowhere in Tellus's Amended Complaint or briefing does it make the argument that the Agency inadequately explained its aggregation of evaluation results into an overall rating. *See* ECF No. 62 at 19–21 (describing the three categories of Tellus's Relevant Experience arguments). Tellus has thus waived its argument that the Agency's ratings were inadequately explained. *Brooks Range Cont. Servs., Inc. v. United States*, 101 Fed. Cl. 699, 708–09 (2011).

original) (quoting AR Tab 123 at 47682); and (3) "[ . . . ] supported technology integration," *id.* The Court, however, cannot find that the Agency acted arbitrarily or capriciously in determining that Project 3-1 demonstrated only minimally relevant experience with regard to COOP services.

To support its argument, Tellus cites language in the SOW for Project 3-1 stating that [ . . . ] shall "accomplish technical program and project life cycle integration; test and evaluation; and[] project management functions that include planning, scheduling, and monitoring." *Id.* (quoting AR Tab 30b.74 at 33505; AR Tab 123 at 47681). Tellus also notes that [ . . . ] supported "continuity and transition transparency for end users and customers." *Id.* (quoting AR Tab 30b.74 at 33505; AR Tab 123 at 47681). But the Agency did not ignore this experience—it simply found it "minimally relevant." AR Tab 107a at 45337. And while Tellus argues that [ . . . ]'s "support activities mirror the COOP element description from the Solicitation," ECF No. 62 at 25, the Agency did not act irrationally in concluding otherwise. The Solicitation stated that it sought experience "[c]onduct[ing] *technical assessments* of current and future . . . efforts for COOP." AR Tab 14a.1 at 1562 (emphasis added). Tellus's experience with "life cycle integration" and "project management," AR Tab 123 at 47681, is not clearly responsive to that Agency need. In large measure, Tellus's arguments are conclusory and merely quote portions of the Project 3-1 SOW and the Solicitation without actually explaining how the work relates to the COOP element. *See* ECF No. 62 at 24–25. As a result, Tellus presents nothing more than its "mere disagreement" with the Agency's findings, which is insufficient to carry its burden. *Croman Corp. v. United States*, 724 F.3d 1357, 1363–64 (Fed. Cir. 2013); *SOFITC3, LLC v. United States*, 178 Fed. Cl. 194, 208 (2025).

Tellus better explains the relevance of [ . . . ]'s support for technology integration, stating that the work "focused on system continuity and meeting customer needs to minimize service disruptions and maintain continuous operations." ECF No. 62 at 25. Tellus compares this effort

25

to the "aspect of COOP where offerors must assist with the 'evaluation of strategic direction for systems to participate in COOP architectures.'" *Id.* (quoting AR Tab 14a.1 at 1562). Even so, the Court does not find that the Agency acted irrationally in deeming this experience irrelevant. While Project 3-1 may have involved technology integration efforts to "incorporate . . . service continuity requirements," AR Tab 123 at 47698, the Agency could rationally find these efforts distinct from strategic planning aimed at COOP architectures. As a result, Tellus is unable to overcome the significant deference the Court must show the Agency when reviewing its analysis of Tellus's proposal. *Glenn Def. Marine*, 720 F.3d at 907 ("The arbitrary and capricious standard applicable in bid protests is highly deferential." (cleaned up)).

Tellus similarly argues that NGA failed to properly evaluate [ . . . ]'s COOP experience under Project 3-3, which Tellus also submitted to show its relevant SBM experience. ECF No. 62 at 26. Tellus argues that the February 2020 Monthly Activity Report ("MAR") submitted under Project 3-3 documented [ . . . ]'s "weekly activities in support of continuity planning and enterprise risk management, including the drafting and assessment of Standard Operating Procedures ("SOPs") designed to mitigate service gaps." *Id.* at 26–27 (citing AR Tab 30b.104 at 34019–20). Tellus specifically cites [ . . . ]'s support for "Business Continuity (BC) planning," which ensured "there [were] no gaps in coverage." *Id.* at 27 (quoting AR Tab 30b.104 at 34019–20). According to Tellus, "[s]uch language contradicts NGA's determination that Project 3-3 lacked experience with business continuity planning to minimize coverage gaps." *Id.* But nowhere in NGA's evaluation of Tellus's Project 3-3 does it make such a finding.

Rather, the Agency found that Project 3-3 "demonstrate[d] minimally relevant experience supporting COOP," specifically acknowledging that [ . . . ] "[a]ssumed duties over . . . Business Continuity/COOP" and "[c]ontinued to provide support" by "responding to agency level taskers/requests for information on . . . Business Continuity (BC) planning." AR Tab 107a at

26

45343–44.   The Agency, however, determined that while this may have demonstrated some experience supporting COOP, it did not "demonstrate relevant experience conducting technical assessments of current and future efforts for COOP to determine the impact on the NSG, or assisting with the review and evaluation of strategic direction for systems to participate in COOP architectures."   *Id.* at 45344.   Indeed, Tellus's cited experience is vague and does not clearly encompass the experience with "technical assessments" and "review and evaluation of strategic direction for systems to participate in COOP architectures" that the Agency sought.   AR Tab 14a.1 at 1562.   The MAR demonstrates that [ . . . ] provided support "responding to agency level taskers/requests for information on . . . Business Continuity (BC) planning" but did not give further explanation as to what that entailed.   AR Tab 30b.104 at 34019.   [ . . . ]'s experience "collecting, reviewing, and editing Standard Operating Procedures (SOPs)" to "ensure that there are no gaps in coverage" was also targeted at a specific team, *id.* at 34019–20, which makes it distinguishable from the Solicitation's emphasis on "technical assessments of current and future DoD and IC efforts for COOP" and broader "COOP architectures."   AR Tab 14a.1 at 1562.

The deferential arbitrary and capricious standard applicable in bid protests "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."   *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).   Because agency officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process," *Impresa*, 238 F.3d at 1332 (cleaned up), the Court does not find that the Agency acted irrationally or failed to consider relevant factors in determining that Tellus lacked COOP experience.

>  c.  *The Agency did not engage in disparate treatment when evaluating Tellus's Relevant Experience, and in any event, Tellus was not prejudiced by the alleged disparate treatment.*

Tellus further claims that "NGA treated similar proposals differently" when evaluating the Relevant Experience factor.  ECF No. 62 at 21.  In particular, Tellus states that although Project 2-1 contained experience that was substantively indistinguishable from the experience of Logic Gate and ProCleared, NGA failed to credit Tellus with Monitor and Control experience, as it did for the two other offerors.[7]  *Id.* at 22–24.  Tellus's claim fails, however, as its cited experience was not indistinguishable from that of Logic Gate and ProCleared.  Further, even assuming that Tellus could establish disparate treatment, it cannot prevail due to lack of prejudice.

The Federal Circuit adopted the test for a disparate treatment claim in *Office Design Group v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020), holding that an agency acts unreasonably when downgrading a protester's proposal "for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals."  A court must ensure that the proposal aspects being compared are truly indistinguishable to prevent the inquiry from devolving into "the second guessing of [procurement] 'minutiae' which [courts] are not allowed to undertake."  *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).  To succeed on a disparate treatment claim, the protester must also show that, but for the disparate treatment, it "had a substantial chance of receiving a contract award."  *Off. Design Grp.*, 951 F.3d at 1373–74.

---

[7] In its Motion for Judgment on the Administrative Record, Tellus also claims that "NGA [] disparately treated Tellus's Project 3-1 when compared to Compass, Inc.'s Project 3-2."  ECF No. 62 at 24.  Tellus later withdrew the argument, stating that it was included inadvertently.  ECF No. 94 at 17 n.4.

Though the Government argues that Tellus must show that its *proposal* was substantively indistinguishable from another offeror's proposal, ECF No. 102 at 24, Tellus contends that a disparate treatment claim can succeed where a *feature* of a proposal is substantively indistinguishable from a feature of another offeror's proposal, ECF No. 94 at 16. The Court agrees with Tellus that *Office Design Group* permits protesters to allege disparate treatment at the feature or element level, though the protester must also demonstrate that such disparate treatment prejudiced the protester. *See* 951 F.3d at 1373–74 (finding that the agency "disparately evaluated [the protester's] technical proposal in two instances" but concluding that the protester "was not prejudiced by [the agency's] disparate treatment"); *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588 (noting that a successful disparate treatment claim "require[s] the existence of nearly identical provisions in the proposals under consideration").

For Project 2-1, submitted by Tellus to demonstrate its relevant Financial Management experience, NGA found that Tellus demonstrated relevant experience for five of the 10 Financial Management elements and thus awarded Tellus 2,000 points. ECF No. 62 at 22 (citing AR Tab 107a at 45324–27). Tellus claims that the Agency acted unreasonably in determining that Project 2-1 did not demonstrate Tellus's relevant experience for a sixth element—Monitor and Control. *Id.* at 22. The Project 2-1 SOW submitted by Tellus stated that: "On an annual basis the Contractor shall assess annual unfunded requirements against the NRO Enterprise Mission Architecture." *Id.* (quoting AR Tab 125 at 47808). Tellus compares this language to the SOW submitted by Innovate Now, which stated that: "The Contractor shall assist the government in performing . . . [ . . . ]." *Id.* at 23 (quoting AR Tab 26b.20 at 18945). Although NGA found Tellus's experience to be "not relevant," AR Tab 107a at 45326, the Agency listed Innovate Now's experience as support for its determination that the "[r]eferenced work demonstrates very relevant experience." AR Tab 103a at 44978–79.

Tellus does not sufficiently explain how "assess[ing] annual unfunded requirements against the NRO Enterprise Mission Architecture" is substantively indistinguishable from "[ . . . ]." Indeed, the Court is not convinced that the two types of experience are substantively indistinguishable. As explained by Innovate Now, "[a]ssessing annual unfunded requirements against an enterprise architecture is not the same activity as [ . . . ]." ECF No. 103 at 4. To find otherwise would cross the line into the impermissible "second guessing of 'minutiae.'" *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588 (quoting *E.W. Bliss*, 77 F.3d at 449).

Tellus also claims that NGA engaged in disparate treatment of Tellus's proposal as compared to that of ProCleared. ECF No. 62 at 23. NGA found that ProCleared had "'very relevant experience' for [the Monitor and Control] element based in part on its experience with '[ . . . ].'" *Id.* (quoting AR Tab 28b.11 at 26615; AR Tab 105a at 45158). According to Tellus, NGA gave Tellus no credit for its "similar experience" with "web-based reporting tools, custom scripts, databases, analytic tools, models, source code, and executable, specialized compilers." *Id.* at 23–24 (citing AR Tab 107a at 45326–27; and then quoting AR Tab 125 at 47808).

Again, Tellus fails to show that the cited aspects of the proposals were substantively indistinguishable. Perhaps Tellus's experience was "similar," *id.* at 23–24, but it was not indistinguishable—as it must be for Tellus to carry its burden, *Off. Design Grp.*, 951 F.3d at 1373. The only aspect of the parties' proposals that could potentially be deemed substantively indistinguishable is their experience with "databases." ProCleared, however, also claimed experience with "[ . . . ]," AR Tab 105a at 45158, that is not clearly encompassed by Tellus's experience with "web-based reporting tools, custom scripts, . . . analytic tools, models, source code, and executable, specialized compilers," AR Tab 125 at 47808.[8]

---

[8] In its Response and Reply, Tellus analogizes its disparate treatment argument to *Golden IT, LLC v. United States*, 165 Fed. Cl. 676 (2023), ECF No. 94 at 15–16, but that case is

Even if the Court were to find that Tellus successfully alleged disparate treatment, Tellus is unable to demonstrate prejudice in two respects. First, there is insufficient evidence that NGA would have found that Tellus "addressed" the Monitor and Control element even if it recognized Tellus as demonstrating some relevant experience. The Court has already rejected Tellus's interpretation of "addressed," finding that the Agency had greater discretion to consider the other tasks/expectations of the Monitor and Control element, none of which Tellus met. *See* AR Tab 107a at 45326–27. Additionally, upon review, it is clear that the Agency's determination that Innovate Now demonstrated very relevant Monitor and Control experience was not based solely, or even in large measure, on Innovate Now's unfunded requirements experience. Instead, the unfunded requirements experience was one line in a paragraph that spanned over half a page, listing numerous areas of experience that supported the Agency's finding that Innovate Now demonstrated very relevant Monitor and Control experience. AR Tab 103a at 44978–79. Tellus does not claim that it shares any of that other relevant experience. Indeed, NGA found that Tellus did not have any relevant experience for the Monitor and Control element whatsoever. AR Tab 107a at 45326–27. Similar to Innovate Now, the Agency also credited ProCleared with Monitor and Control experience in a lengthy paragraph. ProCleared's "[ . . . ]" was just one experience of many through which ProCleared demonstrated that it could meet the Agency's Monitor and Control requirements. AR Tab 105a at 45158–59. As was the case with Innovate Now, Tellus does not purport to have any of this other relevant experience. Thus, Tellus is unable to demonstrate that it was prejudiced by the alleged instances of disparate treatment.

---

distinguishable. In *Golden IT*, the agency noted that the protester lacked experience with Salesforce and SharePoint but "failed to note the same for other offerors with similar levels of Salesforce and SharePoint experience." 165 Fed. Cl. at 687. Thus, *Golden IT* involved an agency's disparate treatment of offerors' prior experience with the exact same technologies. This is not the case here, where the offerors cited different capabilities.

31

Second, even if the Agency did find that Tellus addressed the Monitor and Control element, the Agency retained discretion to ultimately award Project 2-1 a Relevant rating only. Again, because the Court has rejected Tellus's mathematical approach to the Solicitation, Tellus cannot solely rely on its argument that experience with six out of 10 elements automatically entitles it to a Very Relevant rating. *See* ECF No. 62 at 24. For these reasons, Tellus cannot show that, but for the Agency's alleged disparate treatment, Tellus "had a substantial chance of receiving a contract award." *Off. Design Grp.*, 951 F.3d at 1373–74. Instead, it seems far more likely that NGA's overall rating for Tellus's Project 2-1 would have remained the same.

2.        The Agency Rationally Reduced Tellus's Scores for Past Performance.

As to the Past Performance factor, Tellus argues that (1) but for NGA's violations of the FAR and NGA Acquisition Regulation Implementation ("NARI") when administering its past contracts with [ . . . ], Tellus would have received an Exceptional rating for four projects it submitted under Past Performance; and (2) NGA's evaluation of Tellus's past performance was arbitrary and capricious because Tellus failed to consider material that was too close at hand to ignore. Neither argument prevails.

　　　　　a.        *Tellus's objections to NGA's failure to comply with the FAR/NARI in administering its past contracts with* [ . . . ] *are not properly brought in the bid protest forum.*

According to Tellus, the Past Performance Evaluation Team's ("PPET") reduction of Tellus's scores for Projects 1-2, 2-2, 3-2, and 3-3 "was based in large measure on NGA's failure to follow the FAR and NARI requirements regarding the creation of performance assessment reports and consideration of contractor rebuttals to those reports." ECF No. 62 at 27–28. Tellus argues that, but for NGA's failure to comply with the FAR and NARI when administering its previous contracts with [ . . . ], there is a substantial chance that Tellus would have received an Exceptional rating for all four projects. *Id.* at 33.

32

Under the NARI, "Contracting Officers and CORs [Contracting Officer's Representatives] must formally document contractor past performance and prepare a performance assessment report (PAR) . . . for contracts of all types with a period of performance, including options, exceeding one year." NARI § 5X42.1503-90(a). The NARI further requires that: "When the period of performance exceeds 12 months, annual assessment reports shall be completed at the end of the initial 12-month performance period and annually thereafter, until contract completion." *Id.* FAR 42.1502(a) contains a similar mandate: "Past performance evaluations shall be prepared at least annually and at the time the work under a contract or order is completed." Both the FAR and the NARI also require that: (1) the contractor be able to submit a rebuttal to the Agency's review; (2) the rebuttal be considered in issuing the final performance rating; and (3) the contractor be provided with the final evaluation. FAR 42.1503(d), (f); NARI § 5X42.1503-90(b)–(e). Pursuant to the NARI, contractors must also be informed that failure to respond to their evaluation within a designated timeframe constitutes agreement with the assessment. NARI § 5X42.1503-90(b).

Tellus states that "NGA prepared evaluations of [ . . . ] task orders only sporadically, not annually as the FAR and NARI required." ECF No. 62 at 29. Specifically, Tellus claims that because there were eight years of performance prior to the CLOVER awards under each of the five [ . . . ] task orders, NGA should have issued 40 PARs to [ . . . ], one for each annual period of contract performance. NGA, however, only issued 13 PARs. *Id.* Similarly, there were six years of performance under the [ . . . ] task order prior to the time of the CLOVER awards, but NGA issued [ . . . ] only one PAR. *Id.* at 30. Tellus states that NGA's failure to issue these PARs violated FAR 42.1502(a), (d) and NARI § 5X42.1503-90(a). *Id.*

Tellus further claims that the "deficient PAR record was very significant to the evaluation results" in the CLOVER procurement, because for each of the [ . . . ] projects the "CER report relied exclusively on a single PPQ" submitted by the COR that Tellus designated as its POC. *Id.*

33

at 32–33.  In completing the [ . . . ] PPQs, the COR reviewed PARs submitted by previous CORs to evaluate periods of performance that preceded his time on the contract.[9]  *Id.* at 33 (citing AR Tab 30c.77 at 35686–87; AR Tab 30c.78 at 35694–95; AR Tab 30c.82 at 35723–24).  Accordingly, the PPQs completed by this COR were based in part on a review of the deficient PAR record.  *See id.*  As a result, Tellus claims that NGA's FAR and NARI violations "inexorably affected the PPQ assessments and, thus, the CER's reduction in Tellus's score for these Projects."  *Id.*  As for the [ . . . ] project, Tellus states that "the absence of PARs—which would have been too close at hand for NGA to ignore—contributed to the negative assessment."  *Id.*

Tellus also argues that, in relation to the PARs it did create, NGA violated FAR and NARI provisions related to contractor rebuttal statements.  First, Tellus claims that NGA failed to notify [ . . . ] that its failure to respond to the Agency's evaluation within the designated timeframe would constitute agreement with the assessment.  *Id.* at 31.  Second, Tellus asserts that "NGA failed to consider [ . . . ]'s rebuttals in issuing final performance ratings."[10]  *Id.*  And lastly, Tellus states that "NGA failed to provide [ . . . ] with the final evaluations."  *Id.*  Tellus contends that these errors also contributed to the arbitrary and capricious nature of the Agency's Past Performance evaluation.  *See id.*

---

[9] Tellus claims that the COR would have reviewed 20 of the missing PARs had they been issued, ECF No. 94 at 21–22, but this is incorrect.  According to Tellus's own table, only 11 of the missing PARs preceded the time the COR began working with [ . . . ] on the [ . . . ] contract.  *See* ECF No. 62 at 30; AR Tab 30c.77 at 35686 ("I have been COR for the contracts associated with [ . . . ], since October 2020.  I cannot speak to the previous Periods of Performance, but after reviewing the previous PARs submitted . . . .").

[10] Tellus states that "[ . . . ] submitted rebuttals to nine PARs across the six [ . . . ] and [ . . . ] task orders."  ECF No. 62 at 30.

As evidence of the prejudice it experienced due to NGA's FAR and NARI violations, Tellus relies on the Burton Declaration,[11] which purportedly details [ . . . ]'s "[e]xceptional performance" under the [ . . . ] contract. *Id.* at 33. Contained in the Burton Declaration are: (1) nine PPQs completed by [ . . . ] CORs in 2023, who rated [ . . . ]'s performance as Exceptional across all categories, *id.* at 33–34; (2) eight PAR rebuttals [ . . . ] submitted in response to the PARs it did receive under the [ . . . ] task orders, which provide "further evidence of [ . . . ]'s excellent performance," *id.* at 34; and (3) a review of more than 400 MARs and 30 Quarterly Program Management Review reports ("QPMRs") [ . . . ] submitted in performing its [ . . . ] task orders, which also "offer[] additional evidence of [ . . . ]'s outstanding performance," *id.* The Burton Declaration similarly discusses [ . . . ]'s "outstanding" performance under the [ . . . ] task order, *id.* at 34–35, and reviews: (1) "77 MARs and 25 QPMRs that address the successes that [ . . . ] achieved in performing the [ . . . ] task order," *id.* at 35; and (2) [ . . . ]'s rebuttal to the PAR issued by NGA, which provides "further evidence of Tellus's superior past performance," *id.*

In response, the Government relies on the Federal Circuit's opinion in *Bannum* to argue that "claims from a disappointed offeror regarding performance reviews from past contracts are irrelevant in a bid protest, because a bid[ ]protest 'is not the proper forum' to litigate such disputes." ECF No. 79 at 59 (quoting *Bannum*, 404 F.3d at 1353). The Government contends that Tellus's claims instead "involve questions of contract administration that must be brought under the [Contract Dispute Act ("CDA")]." *Id.* (alteration in original) (quoting *ITility, LLC v. United States*, 124 Fed. Cl. 452, 460 (2015)). According to the Government, "Tellus's past performance arguments, therefore, are inappropriate and should be dismissed as outside the scope of a bid protest." *Id.* at 59–60.

---

[11] As noted above, Tellus seeks to supplement the AR with the Burton Declaration, ECF No. 61 at 3–5, which the Court addresses later in this opinion. *See infra* § III.B.

In *Bannum*, the Federal Circuit affirmed that an agency's failure to comply with the FAR in creating Contract Evaluation Forms ("CEFs"), which are the equivalent of NGA's PARs, during past contracts with the protester constituted a violation of law that was properly brought as part of a bid protest. *See* 404 F.3d at 1349–51. Under the solicitation at issue in *Bannum*, bidders were required "to submit a list of all contracts completed [for the agency] in the preceding three years, or currently in process." *Id.* at 1350. The agency evaluated an offeror's past performance by reviewing the CEFs issued under the identified contracts. *Id.* at 1349. As the Circuit explained, FAR 42.1503 governs the process by which agencies issue past performance reviews like CEFs, and in relevant part, requires agencies to "provide for review at a level above the contracting officer to consider disagreements between the parties regarding the evaluation." FAR 42.1503(d); *see also Bannum*, 404 F.3d at 1349.[12] The agency's own procedures, however, did not properly provide for this required review. *See Bannum*, 404 F.3d at 1351–53. As a result, the Federal Circuit found the agency's reliance on the protester's unreviewed CEF scores to be a procurement error. *See id.* at 1353; *see also id.* at 1350 (noting the lower court's holding that the agency "had violated both FAR § 42.1503(b) and the terms of the RFP when assigning weights (based on the CEFs) to Bannum's past contract performance").

The protester in *Bannum* additionally argued that the agency "violated the FAR in failing to assess [the protester's] rebuttals [to the CEFs], on the prior contracts, when assessing its bid," but the Circuit rejected this argument as being outside the scope of a bid protest. *Id.* at 1353. In so ruling, the Circuit relied on a prior decision of the GAO, which held that "a bid protest is not the proper forum, under FAR § 42.1503(b), to litigate CEF disputes." *Id.* (citing *Ocean Tech. Servs., Inc.*, B-288659, 2001 WL 1505946, at *3 (Comp. Gen. Nov. 27, 2001)). In an explanatory

---

[12] The Federal Circuit cited FAR 42.1503(b), but the requirement for review of performance assessments at a level above the contracting officer is now found in FAR 42.1503(d).

parenthetical, the Circuit also included the following quote from the GAO's opinion: "Our bid protest forum is not the place for a firm to first complain of not having received an assessment, nor do we serve as a forum for a firm to dispute the substance of an agency's assessment of the firm's work." *Id.* (quoting *Ocean Tech. Servs.*, 2001 WL 1505946, at *3).

Tellus characterizes *Bannum* as "draw[ing] a key distinction between protests of agency failure to follow FAR procedures in the preparation of performance assessments and protests about the substance of the performance assessments." ECF No. 94 at 18 (citations omitted). According to Tellus, the agency's failure in *Bannum* to review CEFs at a level above the contracting officer was a "procedural" error that the Federal Circuit found to be properly brought in the bid protest context. *Id.* at 18–19. By contrast, the protester's challenge to the agency's failure to assess the protester's performance review rebuttals was "substantive," and thus constituted a CEF dispute "not within the trial court's jurisdiction." *Id.* at 19–20. Tellus asserts that, just as the agency's failure to properly review performance assessments was a procedural error, "so too is the failure of NGA to *create* the performance assessments in the first instance." *Id.* at 19 (emphasis in original).

Tellus also relies on *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765 (2011), as support for its claim that NGA's failure to issue PARs constitutes a procurement error. ECF No. 94 at 20. In *Vanguard*, a judge of this court reviewed a protester's challenge to an agency's past performance evaluation where the agency failed to review—because it never issued—contemporaneous performance evaluations related to its prior contracts with several of the awardees, who were incumbent contractors. *See* 101 Fed. Cl. at 780. Because the agency was given discretion to consider information beyond that required by the solicitation, the court found that the too close at hand doctrine obligated the agency "to draw upon internal information that concerned any of the firms' prior work, even if the offeror did not cite it." *Id.* at 781. As a result,

the agency's failure to issue performance assessments for the incumbents "blinded the agency to information" vital to its evaluation of the incumbents' past performance. *Id.* at 780–81. Although the agency later "instructed the offerors to have at least five of their clients complete a [PPQ]," the Contracting Officer's Technical Representative ("COTR") "declined to provide PPQs for any of the incumbents." *Id.* at 772–73. The *Vanguard* court found this significant, noting that the agency refused to "remedy" its "failure to evaluate the incumbents' performance" by reviewing "PPQs from the [prior contract's] COTR." *Id.* at 782.

Contrary to its argument, Tellus's FAR/NARI-based claim relating to NGA's past contracts with [ . . . ] is not a valid protest ground. The relevant inquiry here is not whether Tellus raises procedural or substantive challenges based on the PARs, but rather whether the Agency's previous failure to issue PARs constitutes an error in connection with this procurement, where the documents relevant to the Agency's Past Performance review were the PPQs, not the missing PARs. The Court finds that it does not.

First, Tellus interprets the holding of *Bannum* too broadly. The Circuit did not hold that every procedural error an agency commits in issuing prior performance evaluations constitutes a valid basis for a subsequent bid protest. Instead, the procedural error at issue was related to a document essential to the agency's review of the offeror's past performance. Under the solicitation at issue in *Bannum*, the agency evaluated an offeror's past performance based exclusively on its CEFs. 404 F.3d at 1349. Thus, as the Government explained at oral argument, the agency's violation of the FAR in *Bannum* "became a procurement error" because the CEFs became "procurement documents." ECF No. 108 at 94:7–14. Indeed, that appears to be how the trial court and protester characterized the claim asserted in *Bannum*. *See* 404 F.3d at 1350 (noting that the protester believed "CEF and rebuttal review would take place in conjunction with the source

38

selection on the RFP"); *id.* (describing trial court's holding that the agency had "violated both FAR § 42.1503(b) and the terms of the RFP" in evaluating the deficient CEFs).

Here, however, the Solicitation required the Agency to consider Tellus's PPQs, not the PARs. AR Tab 17 at 2471. As a result, the case at hand differs from *Bannum* because the relevant procurement documents, the PPQs, were properly created. *See* ECF No. 108 at 94:15–25. Though Tellus argues that the Agency's failure to issue the requisite number of PARs influenced the COR's PPQ assessments, *see* ECF No. 62 at 32–33, the connection is simply too attenuated. Whereas in *Bannum*, the CEF issues "directly impact[ed] an offeror's ability to obtain a full past performance evaluation and compete for a contract," ECF No. 102 at 26, here, the PARs at best only indirectly influenced the Agency's evaluation, as it was the COR (not the PPET) who partly considered PARs in completing the PPQs. *See, e.g.*, AR Tab 30c.77 at 35686–87. Because the Agency only reviewed the PPQs, *see* AR Tab 107b, they are the relevant procurement documents, not the PARs.

The Court also finds it significant that the Circuit in *Bannum* not only cited, but quoted, the GAO's holding that a bid protest "*is not the place for a firm to first complain of not having received an assessment . . . .*" 404 F.3d at 1353 (emphasis added) (quoting *Ocean Tech. Servs.*, 2001 WL 1505946, at *3). When asked at oral argument how it interprets that quotation, Tellus was unable to give a satisfactory answer, merely stating that the "GAO case . . . is secondary to the holding of [*Bannum*]." ECF No. 108 at 34:22–25, 35:1. This does not convince the Court that it should ignore *Bannum*'s quotation of the GAO, which indicates that the Circuit would not consider all procedural errors pertaining to performance assessments to be properly raised in a bid protest, and indeed seems to foreclose the claim Tellus makes here.

Tellus attempts to further support its procedure-versus-substance distinction by relying on *ITility* and *Colonna's Shipyard v. United States*, 146 Fed. Cl. 519 (2020), but such reliance is misplaced, as this distinction is not relevant to the inquiry at issue. Both cases clearly "involved

39

challenges to the *substance* of performance assessments," and thus the claims were not properly raised in the bid protest forum. ECF No. 94 at 20 (emphasis added). The cases are additionally distinguishable because they involved challenges related to procurement documents, unlike the case at hand. *See ITility*, 124 Fed. Cl. at 456 (alleging that "agencies are currently about to evaluate ITility's past performance" by reviewing the purportedly deficient performance assessment); *Colonna's Shipyard*, 146 Fed. Cl. at 520 (alleging that "the agency relied on a CPAR" that the protester contended was "neither factual nor correct" and "that the CPAR directly caused the Navy to reject Colonna's bid" (cleaned up)).

The Court also finds that *Vanguard* does not support Tellus's FAR/NARI arguments. Notably, *Vanguard* did not address the question of whether this Court has bid protest jurisdiction over a protester's claim that an agency violated the law by failing to issue performance evaluations for prior contracts of the protester. Indeed, *Vanguard* did not address jurisdiction at all, nor did it discuss *Bannum*'s holding in that regard. As noted above, the protester in *Vanguard* challenged the agency's past performance evaluations of *the awardees* (who were the incumbents). *See* 101 Fed. Cl. at 780. In other words, it faulted the agency for giving the incumbents more favorable evaluations without adequately reviewing their past performance on the predecessor contract. The *Vanguard* court agreed, finding that the agency in that case entirely failed to evaluate the incumbents' prior performance due to the agency's failure to issue performance evaluations *and* its refusal to complete PPQs on behalf of the incumbents. *See id.* at 781–82. To be sure, *Vanguard* held that the too close at hand doctrine mandated consideration of the incumbents' past performance on the predecessor contract, *id.* at 781, making the agency's failure to create contemporaneous performance assessments a "manifest error," *id.* at 782. However, this error was not dispositive. *Vanguard* recognized that the agency could have reviewed PPQs to evaluate the incumbents' past performance, which the agency in fact instructed all offerors to provide. *Id.* at

40

781–82 ("[N]othing in . . . the FAR[ ] prohibits an agency from evaluating a proposal based on past performance information that was not recorded contemporaneously." (alterations in original) (quoting *Kathpal Techs., Inc.*, B-291637.2, 2003 WL 1918465, at *3 n.7 (Comp. Gen. Apr. 10, 2003))).    The issue was thus not the agency's specific failure to create past performance assessments, but rather its broader failure to evaluate the incumbents' performance on the predecessor contract, even through the use of PPQs.    By contrast, in the case at hand, the Solicitation required NGA to review Tellus's PPQs, AR Tab 17 at 2471, which were made readily available to the Agency.    Thus, even in the absence of PARs, these PPQs provided the necessary insight into Tellus's past performance that was missing in *Vanguard*.

That Tellus challenges its own Past Performance evaluation on the basis of missing PARs is also an important distinction.    In making its FAR/NARI arguments, Tellus, unlike the protester in *Vanguard*, is attempting to take advantage of the Agency's failure to issue PARs even though [ . . . ] never raised any objection at the time the PARs were due.    The case law does not permit such an approach.    Indeed, the GAO decision cited by the Circuit in *Bannum* expressed concern about permitting protesters to challenge an agency's past errors for the first time in a bid protest despite the protester's awareness of the agency's error and its ability to address the error at the time it occurred.[13]    *See Ocean Tech. Servs.*, 2001 WL 1505946, at *3 (noting that the protester "knew (or certainly should have known)" that it was owed performance evaluations upon completion of its contracts and thus should have "addressed the matter with the agency at that

---

[13] At oral argument, counsel for Tellus stated that because "[ . . . ][] was never told by the Government that the Government wasn't going to be conducting [the missing] PAR evaluations," Tellus "didn't know that there was going to be a deficiency in the development of all the PARs by the time of the source selection."   ECF No. 108 at 127:22–24, 128:6–8.   Even if the PARs had been "trickl[ing] in over time," as Tellus claims, *id.* at 127:24–128:4, Tellus could not have reasonably believed that [ . . . ] would receive its 32 missing PARS—some of which stretch back to [ . . . ]'s performance in 2017—prior to the Agency's evaluation of Tellus's Past Performance.

time"). Allowing Tellus to protest NGA's CLOVER procurement because the Agency committed procedural errors in administering [ . . . ]'s [ . . . ] and [ . . . ] contracts creates an undesirable incentive for offerors to sit on their CDA claims and wait for an agency's procedural failure to poison a subsequent procurement.

Tellus also fails to provide a limiting principle for its argument—in other words, it fails to explain what the Agency could have done to rectify the harm from its failure to properly issue PARs. Significantly, unlike in *Bannum*, Tellus does not allege that it was expecting the missing PARs to be created as part of the evaluation in the CLOVER procurement. And it refuses to recognize the ability of PPQs to remedy the alleged FAR/NARI violations, *see* ECF No. 108 at 36:7–18, despite *Vanguard*'s acknowledgement that an agency's review of PPQs can "remedy" missing performance evaluations. 101 Fed. Cl. at 782. Indeed, Tellus does not propose any other potential remedy, instead requesting that the Court rely on Mr. Burton's self-assessment of [ . . . ]'s own performance to find that Tellus should have received higher Past Performance ratings. That simply cannot be the answer. The foregoing reasoning thus provides further support for the Court's determination that Tellus's FAR/NARI arguments are not properly presented in this bid protest.

In sum, the Agency reasonably evaluated Tellus's Past Performance based on the PPQs, which were the relevant procurement documents under the Solicitation. As a result, NGA's failure to issue PARs related to prior contracts is not an error in connection with this procurement, and Tellus's claim that the Agency's Past Performance evaluation was arbitrary and capricious due to NGA's prior FAR/NARI violations is dismissed as outside the scope of this bid protest.[14]

---

[14] Though the Government argues that "Tellus's past performance arguments [] are inappropriate and should be dismissed as outside the scope of a bid protest," ECF No. 79 at 59–60, the Government's Motion to Dismiss is entirely focused on waiver under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), *see* ECF No. 79 at 31–36. Conversely, Exacta's Motion to Dismiss explicitly argues that "Tellus improperly attempts to bring bid protest arguments based on NGA's purported failure to properly administer other contracts" and thus the

Even assuming that NGA's failure to issue PARs in administering its past contracts with [ . . . ] could constitute a valid basis for a bid protest, Tellus's claim fails because it has not sufficiently demonstrated prejudice. The Court does not find Tellus's proffered evidence sufficient to demonstrate that the existence of additional PARs would have changed its PPQ results. To demonstrate "significant prejudice," a protester must show that, but for the Agency's errors, "there was a substantial chance it would have received the contract award." *Bannum*, 404 F.3d at 1353 (quotation omitted).

In *Bannum*, the Federal Circuit found that the protester suffered no prejudice from the Agency's FAR violation because the protester did not explain why it had a substantial chance of scoring higher on past performance had the agency reviewed the CEFs in accordance with the FAR. *Id.* at 1358. As was the case in *Bannum*, Tellus provides no more than "conjecture" to support its contention that additional PARs "would provide it a substantial chance of prevailing in the bid." *Id.*

In an attempt to provide hard facts, Tellus argues that the Burton Declaration contains sufficient evidence of [ . . . ]'s "[e]xceptional performance." ECF No. 62 at 33. The Court is not convinced.[15] The MARs and QPMRs that purportedly document [ . . . ]'s "outstanding performance" were created by [ . . . ] itself, *id.* at 34, and thus reflect [ . . . ]'s own view of its accomplishments and performance, rather than the view of the Agency. The same is true for

---

Court should dismiss Tellus's FAR/NARI allegations as outside this Court's bid protest jurisdiction. ECF No. 86 at 37 (emphasis omitted). Like the Government, Exacta also argues that Tellus's claims are waived under *Blue & Gold*. *Id.* at 39. Because the Court agrees that it lacks bid protest jurisdiction over Tellus's FAR/NARI allegations, the Court grants in part Exacta's Motion to Dismiss. The Government's and Exacta's Motions to Dismiss pursuant to *Blue & Gold* are fully addressed *infra* § III.A.5.

[15] To the extent the Court references the Burton Declaration, it does so as part of the Court's record, rather than as a supplement to the AR. *See infra* III.B.

[ . . . ]'s PAR rebuttals.  Such rebuttals were drafted and submitted by [ . . . ] to counter the Agency's own review.  *See id.* at 31, 34.  As a result, the PAR rebuttals do not provide convincing evidence of how the Agency would rate [ . . . ]'s performance if the Agency issued an additional PAR for a different period of performance.

Moreover, although the nine PPQs referenced in the Burton Declaration were at least created by NGA officials, *id.* at 33–34, the evidence they contain is not enough to demonstrate prejudice.  Significantly, the COR who submitted Tellus's PPQs for this procurement also wrote the majority of the 2023 PPQs referenced by Tellus.  *See* ECF No. 102 at 28 n.6.  It is a circular argument to say that based on the COR's own PPQs, there is sufficient evidence to believe that additional PARs would have changed that very same COR's view of Tellus's Past Performance.  Because Tellus must demonstrate that it had a "substantial chance" of receiving the contract absent the Agency's error, *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation*, 175 F.3d at 1367), whatever persuasive value can be taken from Tellus's evidence is simply not enough for it to prevail.

The Court lastly turns to Tellus's argument that NGA violated FAR and NARI provisions related to contractor rebuttal statements.  *See* ECF No. 62 at 30–31 (stating that NGA failed to (1) warn [ . . . ] that failure to respond to an evaluation constitutes agreement with the assessment, (2) consider [ . . . ]'s rebuttals, and (3) provide [ . . . ] with its final evaluations); *see also id.* at 28 (arguing that "NGA's decision to reduce Tellus's self-assessed score was based in large measure on NGA's failure to follow the FAR and NARI requirements regarding the creation of performance assessment reports and *consideration of contractor rebuttals* to those reports" (emphasis added)). In its Response and Reply, Tellus seems to abandon these claims, stating that it "is not seeking any revisions to the substance of its PARs," but instead "challenges NGA's failure to issue the PARs

44

in the first instance." ECF No. 94 at 21. Nevertheless, the Court will explain why these arguments fail.

First, *Bannum* explicitly states that a bid protest is not the proper forum in which to challenge an agency's alleged failure to consider a protester's performance assessment rebuttals. *See* 404 F.3d at 1353 (noting that "[the protester] further argues that the [agency] violated the FAR in failing to assess [the protester's] rebuttals, on the prior contracts, when assessing its bid" but finding that "a bid protest is not the proper forum" to litigate such disputes). Indeed, Tellus itself recognizes this in its Response and Reply. *Compare* ECF No. 94 at 19–20 ("*Bannum* also involved another challenge, which alleged violation of the FAR in failing to assess Bannum's rebuttals on the prior contracts when assessing its bid. . . . This part of the ruling concerned the 'substantive' challenge to Bannum's assessments, so was not within the trial court's jurisdiction."), *with* ECF No. 62 at 31 (stating that "NGA's failure to consider [ . . . ]'s nine rebuttals and issue final PARs was material" because [ . . . ]'s rebuttals detailed the reasons why [ . . . ] should have received better ratings). Thus, Tellus cannot prevail on its claim that NGA failed to properly consider [ . . . ]'s PAR rebuttals.

The remaining procedural errors alleged by Tellus—that NGA failed to warn [ . . . ] that failure to respond to an evaluation constitutes agreement with the assessment and that NGA failed to provide [ . . . ] with its final evaluations—relate to NGA's issuance of PARs, which are not the relevant procurement documents and thus do not present a valid bid protest ground under *Bannum*. Tellus also presents no evidence that these procedural errors prejudiced it in any way. Tellus has not stated that [ . . . ] would have issued additional rebuttals had NGA warned it that failure to object to its PARs constituted agreement with the performance assessment. And even if those rebuttals existed, whether the Agency properly considered them would be a "substantive" error not appropriate for a bid protest. Tellus has also failed to demonstrate that its Past Performance

45

score would have changed had NGA properly sent [ . . . ] its final evaluations.  The Court finds it difficult to imagine any way Tellus could convincingly make such an argument.  [ . . . ]'s mere possession of its final evaluations could in no way influence their content or the Agency's subsequent reliance on the evaluations.  Therefore, to the extent Tellus maintains these claims, they are rejected.

<blockquote>b.       *The Agency was not required to consider additional evidence relating to Tellus's Past Performance pursuant to the too close at hand doctrine.*</blockquote>

Tellus additionally argues that NGA "acted arbitrarily by ignoring past performance evidence within NGA's possession that was 'too close at hand' to disregard."  ECF No. 62 at 35.  Specifically, Tellus states that, "for the incumbent [ . . . ] task orders, NGA had in its possession three categories of documents that were 'too close at hand' to ignore:" (1) "nine PPQs prepared by NGA CORs in 2023," (2) "eight rebuttals to PARs that [ . . . ] submitted to NGA in 2021 and 2022," and (3) "20 MARs submitted in Tellus's proposal."  *Id.* at 36.  The CER, however, purportedly considered none of this information.  *Id.* (citing AR Tab 107b).  As for the [ . . . ] task order, Tellus claims that "NGA had in its possession two types of documents that were too close at hand to ignore: (1) the PAR rebuttal that [ . . . ] had submitted to NGA and (2) seven MARs submitted in Tellus's proposal."[16]  *Id.* at 37.  Again, the CER purportedly considered none of this information.  *Id.*

Under the too close at hand doctrine, an agency may be obligated to consider past performance information not cited in an offeror's proposal if the agency possesses or has personal knowledge of that information.  *ProSecure, LLC v. United States*, 151 Fed. Cl. 697, 707 (2020).  The too close at hand doctrine was developed by the GAO, which recognized that "some [past

---

[16] The Burton Declaration, with which Tellus seeks to supplement the AR, contains most of the documents Tellus claims were too close at hand to ignore.  *See* ECF No. 61 at 5.

performance] information is simply too close at hand to require offerors to shoulder the inequities that spring from an agency's failure to obtain, and consider, the information." *Int'l Bus. Sys., Inc.*, B-275554, 1997 WL 113958, at *4 (Comp. Gen. Mar. 3, 1997). The doctrine seeks to ensure that the wide discretion of contracting officials does not "result in inequitable selections of the information used to evaluate the bids." *Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 398, 411 (2021).

The Government responds to Tellus's invocation of the too close at hand doctrine by arguing that the 2023 PPQs, PAR rebuttals, and MARs are outside the Solicitation's evaluation scope and thus are not covered by the too close at hand doctrine. ECF No. 79 at 60–61 (citing *Walden Sec. v. United States*, 136 Fed. Cl. 216, 229 (2018)). Here, the Solicitation required that NGA consider "information from the Offeror's proposal submissions," but it gave the Agency discretion whether to consider "data obtained from other sources." *Id.* at 61 (citing AR Tab 17 at 2471). Thus, in the Government's view, the Agency could not have been required to consider Tellus's cited documents because that would contravene the Solicitation's directions. *Id.* (citing *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 720 (2010), *abrogated on other grounds by Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir. 2021)). In its Reply, the Government further notes that the Solicitation forbade consideration of proposals submitted after the deadline. *See* ECF No. 102 at 29 (citing AR Tab 17 at 2445). Accordingly, the Government argues that, at the very least, the Agency could not have evaluated the 2023 PPQs because they post-dated the submission deadline. *Id.* The Government also expresses concern that Tellus's view of the too close at hand doctrine "give[s] an unfair advantage to incumbents," as evaluators would be required to "continually consider new performance reviews provided to an offeror on other contracts with that agency." ECF No. 79 at 61.

47

In its Response and Reply, Tellus emphasizes that "[t]he RFP did not forbid consideration of documents outside the Offeror's proposal submission," but rather gave the Agency discretion to review "data obtained from other sources, *as applicable*." ECF No. 94 at 23 (emphasis in original) (quoting AR Tab 17 at 2615). Tellus also distinguishes *Walden* and *Linc Government Services*, stating that *Walden* only stands for the narrow proposition that agencies cannot allow one offeror to submit new past performance references but not permit others to do the same, and characterizing *Linc Government Services* as a case where the RFP expressly proscribed agency review of material external to the proposal. *See id.* at 24–25.

The Court agrees that the documents Tellus cites as being too close at hand were not outside the Solicitation's scope. In *Linc Government Services*, the RFP expressly stated that evaluators "shall not consider or use as a basis for evaluation any assumptions, preconceived ideas, and personal knowledge or opinions not supported by material provided in the proposal." 96 Fed. Cl. at 720. Here, the Solicitation at issue did not contain a strict prohibition. *See* AR Tab 17 at 2471. Indeed, the too close at hand doctrine exists to cabin agency discretion under solicitations like the one at issue, where the agency has some choice in what it reviews when evaluating past performance. *See Insight Pub. Sector*, 157 Fed. Cl. at 411. Additionally, although the Solicitation prohibited evaluation of proposals submitted after the deadline, AR Tab 17 at 2445, it did not place a time constraint on the data the evaluation teams could consider, instead merely stating that the Agency maintained discretion to "use data obtained from other sources." AR Tab 17 at 2615.

Though the Court rejects the Government's argument that the materials cited by Tellus are outside the scope of the Solicitation, it does not find that the Agency abused its discretion in choosing not to review the documents Tellus claims were too close at hand. In general, agencies are given broad discretion to determine what information they review when evaluating an offeror's past performance. *Walden*, 136 Fed. Cl. at 229. This discretion is needed to protect the deference

48

courts owe agency decisionmakers. *See Crowley Gov't Servs., Inc. v. United States*, 158 Fed. Cl. 358, 375 (2022) ("[T]he role of the Court is not to determine what [the agency] could have done in its evaluation; rather, it is to determine whether [the agency] had a rational basis for what it did." (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In turn, the too close at hand doctrine ensures that an agency does not abuse that broad discretion by ignoring highly relevant information. *See Insight Pub. Sector*, 157 Fed. Cl. at 411.

Here, the material Tellus cites as being too close at hand was simply not relevant enough to the Agency's evaluation of Tellus's Past Performance so as to trigger the doctrine, and thus the Agency did not abuse its discretion by electing not to review it. *See Walden*, 136 Fed. Cl. at 229 (explaining that "an agency acts unreasonably when it fails to consider *relevant* information which is too close at hand" (emphasis added) (quotation omitted)). First, the PAR rebuttals submitted by [ . . . ] do not reflect objective insight into [ . . . ]'s past performance under the [ . . . ] and [ . . . ] contracts. Considering that the PAR rebuttals were submitted by [ . . . ] to dispute the Agency's own view of [ . . . ]'s performance, it was rational for the Agency to rely solely on Tellus's proposal and the PPQs it submitted, which were issued by a government COR. This same conclusion applies to Tellus's assertion that NGA was arbitrary and capricious in failing to review the MARs Tellus included as part of its Relevant Experience submission. Again, these MARs solely reflect [ . . . ]'s summary of the tasks it completed, rather than the Agency's view of the quality with which [ . . . ] completed those tasks. *See, e.g.*, AR Tab 30b.40 (example of a MAR drafted by an [ . . . ] employee). As a result, they are not particularly relevant evidence of NGA's assessment of [ . . . ]'s past performance under the [ . . . ] and [ . . . ] contracts, and thus the Agency was justified in electing not to review them as part of its evaluation.

Second, the PPQs issued by NGA CORs in 2023 are largely redundant of the PPQs Tellus submitted as part of its proposal. *See Aery Aviation, LLC v. United States*, 179 Fed. Cl. 392, 407

49

(2025) (rejecting a plaintiff's motion to supplement the AR with a document that was allegedly "too relevant and close at hand to ignore" because the information contained in the document was "redundant of evidence specifically considered by the [agency] during its evaluation of [the plaintiff's] proposal"). Though the two sets of PPQs may have contained different narrative explanations and evaluation results, they reviewed the same underlying performance and provided the same type of past performance analysis. There was thus no reason for the Agency to seek out the 2023 PPQs, many of which were completed by the same COR who submitted Tellus's PPQs. And because Tellus was able to choose the POCs it wanted to complete its PPQs, *see* AR Tab 107b at 45351–52, there was also no reason for the Agency to consider the views of a different COR by reviewing PPQs he completed after Tellus submitted its proposal.

Even if the Court does not view the 2023 PPQs as being redundant, it still rejects Tellus's claim that the 2023 PPQs were too close at hand to ignore. As the Government correctly argues, ruling that an agency is *required* to consider additional PPQs completed after the deadline for proposal submissions would unfairly favor incumbents or those who have other contracts with the Agency. ECF No. 79 at 61. The court in *Walden* expressed a similar concern, rejecting a plaintiff's argument that the agency was required to consider additional past performance information developed well after the proposal deadline, as other offerors were unable to submit comparable information. 136 Fed. Cl. at 229. Tellus claims that the Agency's consideration of its too close at hand materials would not "afford Tellus any unfair advantage," ECF No. 94 at 24, but simultaneously fails to grapple with the question of whether NGA would thus be obligated to consider additional PPQs for all other incumbents or offerors. Tellus similarly fails to explain where the Agency could permissibly draw the line and refuse to consider further performance assessments. *See id.* at 23 (acknowledging that Tellus's 2023 PPQs were issued after NGA completed its initial evaluation without explaining how this timing impacts the applicability of the

50

too close at hand doctrine).[17]  The Court will not rule that the too close at hand doctrine extends so far.  Because Tellus's submitted PPQs already provided the Agency with sufficient past performance information, NGA did not abuse its discretion in electing not to consider successive PPQs.

Tellus's reliance on *Seattle Security Service, Inc. v. United States*, 45 Fed. Cl. 560 (2000), is misplaced.  According to Tellus, *Seattle Security Service* demonstrates that the too close at hand doctrine "applies particularly to 'past performance of an incumbent on the very contract to be resolicited,'" ECF No. 62 at 36 (quoting *Seattle Sec. Serv.*, 45 Fed. Cl. at 569), but the case does not stand for such a broad proposition.  In *Seattle Security Service*, the solicitation at issue combined two contracts that were originally performed by the protester.  45 Fed. Cl. at 567.  Although the protester referenced both contracts in its proposal, the agency only considered one.  *Id.*  In doing so, the agency "systematically prejudiced the plaintiff," since the full effect of the protester's experience could only be appreciated if the contracts were viewed in conjunction.  *Id.*  The court thus found that the agency's evaluation was arbitrary and capricious, as agencies "may not disregard the past performance of an incumbent on the very contract to be resolicited."  *Id.* at 568.  NGA did not disregard [ . . . ]'s past performance on [ . . . ].  Rather, it fully reviewed the submitted PPQs that addressed [ . . . ]'s performance under [ . . . ] and based its evaluation of Tellus's Past Performance on the information they contained.  *See* AR Tab 107b at 45356–57, 45359–61.  That is sufficient to ensure the Agency did not unfairly "disregard the past performance of an incumbent."  *Seattle Sec. Serv.*, 45 Fed. Cl. at 568.

---

[17] Notably, the corrective action mandated a re-evaluation of the offerors' existing Relevant Experience, Past Performance, and Risk Assessment volumes, with no opportunity for revision. *See generally* AR Tab 59; *see also* AR Tab 70 at 42778 (informing offerors that, other than re-certifying their previously submitted labor rates, "[n]o other proposal revisions will be accepted").

Accordingly, Tellus fails to show that NGA abused its discretion in refusing to consider the 2023 PPQs, [ . . . ]'s PAR rebuttals, and the MARs. Instead, the Agency acted reasonably when it elected to evaluate Tellus's Past Performance on the basis of the PPQs completed by Tellus's selected COR.

3.    NGA Reasonably Found that Tellus's Documentation Was Too Heavily Redacted to Verify the Working Partnership Between [ . . . ] and [ . . . ] under the Risk Assessment – Organizational Structure Factor.

According to Tellus, it deserved its self-score of 2,000 points for the Risk Assessment – Organizational Structure factor because "[ . . . ] or [ . . . ] 'previously performed with greater than or equal to 60% of all Partners and proposed subcontractors under previous agreements/contracts.'" ECF No. 62 at 38 (quoting AR Tab 17 at 2464). The Agency, however, awarded Tellus only 1,000 points, noting that Tellus's supporting documentation was "heavily redacted," thus making it "unclear to the evaluator on the validity of the agreements/subcontracts." AR Tab 107d at 45373–74. Tellus has not met its burden to show that this finding lacked a rational basis.

Per the Solicitation, an offeror could earn 2,000 points under Risk Assessment – Organizational Structure by demonstrating that: "The Protégé or Mentor has previously performed with greater than or equal to 60% of all Partners and proposed subcontractors under previous agreements/contracts." AR Tab 17a 2625. The Solicitation defined "previously performed" as "performance that took place before the issuance of the CLOVER solicitation, for a period of no less than one complete Period of Performance on another contract action, or for a period totaling one calendar year." AR Tab 17 at 2463. To verify its claimed previous performance, the offeror was required to include: (1) "[t]he contract or Task Order for which the work was performed," and (2) "[e]vidence of the business arrangement," such as "[a] [j]oint venture agreement that identifies all members" or "[a] copy of the subcontract(s)." *Id.* at 2464.

52

The RFP explicitly stated that it was "**the responsibility of the Offeror to ensure that any supporting documentation clearly represents the working partnership on the previously performed work**." *Id.* (emphasis in original). Though offerors were permitted to submit redacted documents, the Solicitation warned that they would do so "at the risk of not receiving credit for the redacted submission if the Government source selection team cannot sufficiently understand and / or verify the information submitted." *Id.* at 2444. Accordingly, redacted documents were "discouraged." *Id.*

The Risk Assessment Evaluation Team ("RAET") was unable to confirm [ . . . ] and [ . . . ]'s working relationship due to the redactions to the [ . . . ] Task Order [ . . . ] Modification and the [ . . . ] Task Order [ . . . ] Modification, which Tellus submitted as supporting documentation. AR Tab 107d at 45373–74. With regard to Task Order [ . . . ], NGA took issue with the absence of a signature block for the subcontractor, [ . . . ]—as the modification submitted was unilateral—and noted that Tellus similarly redacted all other information that could demonstrate "if there was actual performance awarded" under the Task Order. *Id.* at 45374. As for Task Order [ . . . ], NGA found that "all information and signature blocks have been redacted that would demonstrate a signed agreement between the two parties." *Id.* Further, "[t]he tables that would have demonstrated if work was actually aligned between the two parties have also been redacted." *Id.*

Tellus asserts that "[f]rom the material submitted, [] NGA cannot credibly question the validity of the assertion that [ . . . ] had previously performed with [ . . . ] as a subcontractor under Task Orders [ . . . ] and [ . . . ]." ECF No. 62 at 41. Tellus specifically points to the introductory paragraph of the documentation for Task Order [ . . . ], which states that: "This Task Order Modification, effective January 9, 2019 is made between [ . . . ] . . . and [ . . . ] . . . ." *Id.* at 41–42 (quoting AR Tab 30f.8 at 36097). According to Tellus, "Task Order [ . . . ] begins in essentially

53

the same manner." *Id.* at 42 (citing AR Tab 30f.9 at 36101). Tellus also notes that the task order modifications include: "(1) actual signature blocks for both [ . . . ] and [ . . . ] that were signed by [ . . . ]'s Director of Contracts and the [ . . . ] Contract Manager, (2) a modification summary that explained each prior modification to the subcontract, (3) the labor positions affected by the modification, and (4) funding information and contract value." *Id.* (citing AR Tab 30f.8 at 36097–100). As evidence that the working relationship between [ . . . ] and [ . . . ] met the Solicitation's duration standard, Tellus cites the statement in the Task Order [ . . . ] documentation that a prior modification exercised Option Year 1, which spanned from September 29, 2018, to September 28, 2019. *Id.* (citing AR Tab 30f.8 at 36098). Though Tellus notes that the redactions "covered financial and other sensitive commercial information," it maintains that "the submission of the actual contractual documents provided clear evidence that the parties in fact previously performed work together." *Id.* at 43. Tellus therefore contends that "[i]t was unreasonable for the evaluators to reject the documentation based on some redactions to the details in the documents." *Id.*

The problem is, Tellus did not merely redact "some" details. The record instead reflects that Tellus redacted the task order modifications almost in their entirety. As for Task Order [ . . . ], the extent of Tellus's redactions make it such that what remains appears only to be the standard outline of a task order modification. *See* AR Tab 30f.8. All the hours worked are redacted, as are the names of those working under the Task Order. *Id.* And contrary to Tellus's assertion, the Task Order Modification does not include funding information and contract value, because those sections, too, are fully redacted. *See id.* at 36099–100. Additionally, the language Tellus cites as demonstrating that [ . . . ] and [ . . . ] had a working relationship for at least one year/one period of performance—"Modification exercises Option Year 1 (September 29, 2018 through September 28, 2019)"—is found in the section of the Task Order Modification that describes past modifications. *Id.* at 36098. The Task Order Modification Tellus submitted was Modification 3,

54

a unilateral modification that merely removed an individual and his associated position from the contract and reduced incremental funding. The bilateral modification that exercised Option Year 1 was Modification 1. *Id.* at 36097–98. As a result, though it may have been possible for the Agency to *infer* a working relationship from the unilateral modification Tellus submitted, the Solicitation explicitly required that the working relationship be "**clearly represent[ed]**." AR Tab 17 at 2464 (emphasis in original). Based on Tellus's heavy redactions to a unilateral task order modification, the Court finds it was rational for the Agency to determine that it needed to see a more direct representation of the working relationship between [ . . . ] and [ . . . ].

The documentation for Task Order [ . . . ] is similarly deficient. Though the modification submitted under Task Order [ . . . ] was bilateral, Tellus fully redacted the signatures of both parties. AR Tab 30f.9 at 36101. Particularly in light of the Solicitation's demand that the documentation "clearly represent[]" the working relationship, AR Tab 17 at 2464 (emphasis omitted), it was reasonable for the Agency to find that it could not verify [ . . . ] and [ . . . ]'s working relationship in the absence of signatures, which are fundamental to a valid contract. Additionally, Tellus again redacted all information related to the hours worked, funding information, and contract value, AR Tab 30f.9 at 36103–04, further obscuring the nature and extent of the parties' relationship. The Task Order Modification also contains no insight into the duration of [ . . . ] and [ . . . ]'s relationship, and consequently cannot provide the evidence the Agency needed to verify that [ . . . ] and [ . . . ] met the Solicitation's definition of "past performance."[18]

---

[18] Tellus also claims that the Agency irrationally concluded that it could not verify the duration of Tellus's working relationships because Tellus's proposal stated that Task Orders [ . . . ] and [ . . . ] "together span over a year" and the other subcontractors were "long term (over a year) subcontractors to [ . . . ] on [ . . . ]." ECF No. 94 at 27 (quoting AR Tab 30f.2 at 36070). However, Tellus could not simply claim that its working relationships met the Solicitation's duration requirement; Tellus was required to submit documentation proving that it was true. *See* AR Tab 17 at 2464 (requiring offerors to verify their claimed working relationships by submitting "[t]he

*See generally* AR Tab 17 at 2463.  Tellus thus cannot rely on Task Order [ . . . ] to rectify the absence of validating information in Task Order [ . . . ].

The RAET found similar redaction issues present in the documentation submitted for [ . . . ]'s claimed business relationships with five other subcontractors.  AR Tab 107d at 45374 (stating that "the same problem continues in which the subcontracts are redacted to the point that it is unclear of the working partnership and claimed previous performance").  Indeed, Tellus argues that the task order modifications submitted for the subcontractors "had the same appearance and type of content as the task order/subcontract modifications between [ . . . ] and [ . . . ] discussed above."  ECF No. 62 at 43.  Tellus does not defend these modifications on an individual basis. Thus, as the Court rejects Tellus's argument that the Agency acted irrationally in refusing to verify the relationship between [ . . . ] and [ . . . ], so too must it reject Tellus's argument that the Agency acted irrationally in refusing to verify [ . . . ]'s relationships with these subcontractors.  Even so, upon review of Tellus's submitted documentation, the Court finds the Agency to have rationally concluded that the documents suffer from the same deficiencies as those previously discussed. Each of the modifications redacts the parties' signatures, the number of hours worked, funding information, and contract value, leaving very little to reveal the nature or validity of the parties' working relationship.  *See* AR Tab 30f.5 at 36080, 36084–85; AR Tab 30f.6 at 36086, 36090–91; AR Tab 30f.7 at 36092, 36095–96; AR Tab 30f.10 at 36105, 36110–11; AR Tab 30f.14 at 36118, 36122–23.

In sum, the Court rejects Tellus's contention that "there was no reasonable basis to question whether the eight identified instances of previous performance actually occurred."  ECF No. 62 at 43.  Contrary to Tellus's characterization, it did not merely redact "some" detail from the task

---

contract or Task Order for which the work was performed" and "[e]vidence of the business arrangement").

order modifications but rather redacted almost every piece of information that pertained to the work performed.  The Agency rationally found that these redactions prevented it from validating the parties' working relationships.

4.      Tellus Has Not Demonstrated that the Agency Failed to Conduct a Meaningful Re-Evaluation.

Apart from the alleged evaluation errors, Tellus argues that the Agency's "re-evaluation of Tellus's proposal was unreasonable because the Agency did not meaningfully review Tellus's proposal, as the Agency represented it would."[19]  *Id.* at 16.  As support for this claim, Tellus emphasizes the fact that the Agency gave Tellus the same scores and largely the same written explanations upon re-evaluating Tellus's proposal.  *Id.* at 17 (stating that the Court should compare AR Tab 41a with AR Tab 107a (Relevant Experience), AR Tab 41b with AR Tab 107b (Past Performance), and AR Tab 41d with AR Tab 107d (Risk Assessment)).  According to Tellus, the "only logical explanation" for the "near identicality of the two sets of evaluation results" is that NGA's re-evaluation of Tellus's proposal "was superficial and failed to meaningfully consider the merit of the proposal."  *Id.*  Tellus cites ProCleared's change in score as evidence that "where the Agency chose to meaningfully re-evaluate[] a proposal, the results could be radically different."  *Id.*  Indeed, according to Tellus, if the Agency had conducted a meaningful re-evaluation, "it would have corrected its earlier errors in scoring Tellus's Relevant Experience, Past Performance, and Risk Assessment submissions, which would have increased Tellus's total points to 70,750 and

---

[19] Tellus accuses the Agency of "prioritiz[ing] speed over competition," ECF No. 62 at 16, and argues that the "supposed re-evaluation was effectively a rubber stamp on the original evaluation," *id.* at 17–18.  Though Tellus's arguments seem to allege bad faith on the part of the Government, *see Syneren Techs. Corp. v. United States*, 166 F.4th 1040, 1046 (Fed. Cir. 2026) (addressing a protester's argument that the agency's re-evaluation was designed to reach a "predetermined result" as an allegation of bad faith), Tellus has explicitly stated that it is not raising such an argument.  Mar. 16, 2026 Oral Arg. Tr. at 8:25–9:3, ECF No. 91.  Any attempt to make such a bad faith argument would need to be supported by clear and convincing evidence, *Am-Pro Protective Agency*, 281 F.3d at 1239–40, which Tellus has not purported to present.

57

placed Tellus among the top five awardees." *Id.* at 18. Tellus claims that the Agency's failure to conduct a meaningful re-evaluation renders its evaluation of Tellus's proposal arbitrary and capricious.[20] *Id.* at 16.

As support for its claim that the Agency failed to conduct a meaningful re-evaluation, Tellus contends that the AR contains "no documents explaining anything about the re-evaluation" and "*no* evidence of the evaluators having again reviewed Tellus's proposal." ECF No. 94 at 11 (emphasis in original). Tellus argues that because the Agency failed to document its re-evaluation, the Court must conclude that it acted irrationally. *Id.* at 12 (citing *22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 397–98 (2025)). Tellus is incorrect, however, to say that there is no evidence and no documentation of the re-evaluation conducted by NGA. Though the record may not detail the re-evaluation to the extent Tellus would desire, the Court finds that the AR contains ample evidence of the re-evaluation, as shown in the evaluation and decision documents appropriately issued upon completion of the re-evaluation. *See, e.g.*, AR Tabs 98–108 (the CERs issued upon re-evaluation); AR Tab 112 (the SSEB report that explained the re-evaluation process); AR Tab 113 (the SSDD that detailed how the SSA's decision had changed upon re-evaluation).

Importantly, "[t]he presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties." *Miley v. Principi*, 366 F.3d 1343, 1347 (Fed. Cir. 2004). As a result, courts are permitted to "presume that what appears regular is regular." *Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001); *see also Linc Gov't Servs.*, 96 Fed. Cl. at 720 (rejecting a plaintiff's "baseless charge"

---

[20] Though Tellus does not fully define what it means for a re-evaluation to be meaningful, Tellus argues that, at bottom, it must entail "a re-reading of the evaluation reports." ECF No. 94 at 11.

that the agency did not actually do what it said it did because "procurement officials are entitled to a strong presumption of regularity and good faith"). Tellus provides no such evidence to rebut the presumption here.

Tellus's arguments are largely based on its belief that, upon re-evaluation, "invariably there would have been some new views, reflected in differences between the original and new reports." ECF No. 94 at 11. At oral argument, Tellus could not cite any evidence to support its position, instead citing "human nature" as the basis for this belief. *See, e.g.*, ECF No. 108 at 18:22–19:1 ("I would submit that it's human nature that when we study something that is very complex a second time, that we almost formulate . . . some slightly different impression of what it says than the first time we did it."). Thus, in Tellus's view, the "logical inference" from the identicality of the reports is that the Agency entirely failed to re-read and deliberate upon Tellus's proposal. ECF No. 94 at 11. But a much more likely explanation—and one more in line with the presumption of regularity—is that neither Tellus's score nor its evaluations changed because the Agency found that it got it right the first time. This explanation is further confirmed by numerous CERs, which explicitly state that "[i]f the [evaluation team's] analyses or conclusions did not change, the revised CER was unmodified from the original CER." *E.g.*, AR Tab 107a at 45297. As the Agency's evaluative judgments did not change, neither did the substance of the reports. Indeed, to go through and change substantive details in an evaluation report that was perfectly satisfactory in its original form would be a waste of agency resources.

Moreover, as detailed in Sections III.A.1–3, the Court agrees that NGA's re-evaluation of Tellus's proposal was rational and conducted in accordance with the law. Accordingly, Tellus cannot demonstrate that it was prejudiced by any purported failure of the Agency to meaningfully re-evaluate its proposal. In the absence of prejudice, Tellus's meaningful re-evaluation claim

cannot survive independently, and must be rejected.[21] *See* ECF No. 108 at 22:6–14 (conceding that "Count 1 [Tellus's allegation that the Agency failed to meaningfully re-evaluate its proposal] . . . does require a showing of prejudice" and that such a showing relies on "the flaws in the evaluation results . . . that [Tellus] demonstrated in Count 2 [Tellus's claim that NGA's evaluation of Tellus's proposal was unreasonable]").

5.      Because Tellus's Protest Does Not Prevail on the Merits, the Court Finds It Unnecessary to Rule on the Government's and Exacta's Motions to Dismiss.

Citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007), the Government separately moves to dismiss Tellus's protest, arguing that Tellus waived its right to raise any objection to the results of the re-evaluation by failing to challenge the Solicitation and its original evaluation in 2023 when Tellus received its debriefing. ECF No. 79 at 31. Exacta similarly argues that "Tellus's challenges to its past performance should [] be dismissed based on the waiver principles set forth in *Blue & Gold Fleet*." ECF No. 86 at 34. Exacta more narrowly focuses its dismissal arguments on Tellus's FAR/NARI violations, contending that because Tellus knew of the violations and their potential impact on its Past Performance assessment prior to the submission of its proposal, or at least upon receipt of its debriefing, it cannot bring such arguments now. *Id.* at 39–45.

Considering the Court's rejection of Tellus's arguments on the merits or for lack of jurisdiction, it is unnecessary to rule on the *Blue & Gold* waiver question posed by the Government's and Exacta's respective dismissal requests. In that respect, the motions are denied.

---

[21] The Government and Exacta argue that Tellus's claim regarding the meaningfulness of the re-evaluation is speculative and thus should be dismissed pursuant to RCFC 12(b)(6) for failure to state a claim. ECF No. 79 at 36–37; ECF No. 86 at 34–36. As both parties asserted these dismissal arguments in their Cross-Motions for Judgment on the Administrative Record, the Court finds that no efficiency would be gained from dismissing Tellus's claim pursuant to RCFC 12(b)(6) and thus solely grants the Government's and Exacta's Cross-Motions for Judgment on the Administrative Record.

**B.    The Court Denies Tellus's Motion to Complete and Supplement the Administrative Record, Order Depositions, and Temporarily Suspend Briefing.**

In conjunction with its dispositive motion, Tellus filed a Motion to Complete and Supplement the Administrative Record, Order Depositions, and Temporarily Suspend Briefing. ECF No. 61. In its motion, Tellus first asked the Court to direct the Agency to complete the AR by adding two sets of documents: (1) all documents prepared by the members of the REET, the PPET, and the RAET in connection with the preparation of their re-evaluation reports, including any documents that relate to the nature or extent of the re-evaluation the teams undertook; and (2) the PARs that the COR reviewed in completing the PPQs for three projects submitted by Tellus. *Id.* at 2–3.

The Court denied Tellus's request, as Tellus's motion was unsupported by "evidence of actual omissions." *Competitive Innovations, LLC v. United States*, 175 Fed. Cl. 296, 306–07 (2025). To overcome the presumption that the administrative record is complete, a plaintiff "must provide 'clear evidence' that the record lacks information 'that was generated and considered by the agency'" in reaching the challenged decision. *CAN Softtech, Inc. v. United States*, 173 Fed. Cl. 480, 484 (2024) (quoting *Poplar Point I*, 145 Fed. Cl. at 494), *reconsideration denied*, 174 Fed. Cl. 412 (2024). Tellus did not do so. Instead, Tellus's motion relied on a "[b]ald allegation[]" that the re-evaluation "lack[s] explanation." *Competitive Innovations*, 175 Fed. Cl. at 306–07. Tellus cannot overcome the presumption of completeness by simply arguing that there must be more evidence demonstrating the nature and extent of the re-evaluation. *See id.*; *BHB Ltd. P'ship v. United States*, 147 Fed. Cl. 226, 229 (2020) (rejecting a plaintiff's motion to complete where the plaintiff solely presented "a list of what [were] essentially document requests, seeking categories of documents they believe[d] [were] necessary to understand better the agency's decision-making process"); *Xerox Corp. v. United States*, No. 21-1807, 2021 WL 9563553, at *5

61

(Fed. Cl. Dec. 17, 2021) (denying a plaintiff's motion to complete where the plaintiff failed to "point to any specific document that [was] missing from the record and instead [sought] a broad category of [documentation], believing that there must be some further explanation for the Agency's decision"). Thus, Tellus failed to make the requisite showing with respect to documents relating to the nature or extent of the re-evaluation.

Similarly, Tellus failed to show that the PARs referenced by the COR in several of Tellus's PPQs were reviewed by the relevant agency decisionmakers. *See Smith v. United States*, 114 Fed. Cl. 691, 695 (2014) ("If an agency omits information that was generated and considered by the agency, then it is properly part of the administrative record, and is admissible to complete the record . . . ." (quotation omitted)), *aff'd*, 611 F. App'x 1000 (Fed. Cir. 2015). Instead, the evidence demonstrates that only the COR who completed Tellus's PPQs reviewed the PARs. *See, e.g.*, AR Tab 30c.77 at 35686–87. In turn, the relevant Agency evaluators reviewed the PPQs, but not the PARs. AR Tab 107b at 45356–57. Tellus failed to cite any case holding that an agency is deemed to have considered documents that were reviewed by a third-party simply because the third-party referenced the documents in a report reviewed by the agency during the decision-making process.[22] As a result, the Court denied Tellus's Motion to Complete the Administrative Record with the PARs.

The Court further denied Tellus's Motion to Order Depositions and Motion to Supplement the Administrative Record with deposition transcripts. "[T]he focal point for judicial review

---

[22] At oral argument on the motion, Tellus characterized *Tauri Group, LLC v. United States*, 99 Fed. Cl. 475 (2011), as "a case where the Court required that the Government complete the record by providing worksheets, and I doubt very much that those worksheets themselves were considered by the source selection official." ECF No. 91 at 18:14–17. *Tauri Group*, however, is not on point, as those "worksheets" were not created by individuals wholly external to the Solicitation. *See Tauri Group*, 99 Fed. Cl. at 481 (permitting the AR to be completed with worksheets created by one of the solicitation's evaluation teams).

should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142. Accordingly, courts should only order supplementation of the administrative record where it is necessary for effective judicial review. *Axiom*, 564 F.3d at 1381. Due to this stringent standard, and the Supreme Court's admonition to avoid inquiry into the mental processes of agency decision makers, "it is exceedingly rare for a court to allow depositions." *Constr. Helicopters Inc. v. United States*, 169 Fed. Cl. 102, 111 (2024); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[S]uch inquiry into the mental processes of administrative decisionmakers is usually to be avoided."). To justify a request for a deposition, the plaintiff must demonstrate "a specific reason to believe there is information that cannot be gathered from the existing written record." *Constr. Helicopters*, 169 Fed. Cl. at 111.

Tellus claimed that its requested depositions were necessary to reveal the "nature and extent of the re-evaluation," and, for two of the depositions, to "develop[] the record of the proximity of the past performance documents that were close at hand to NGA decision-makers in this procurement." ECF No. 61 at 6–7. At oral argument on the motion, Tellus informed the Court that it withdrew the latter argument. ECF No. 91 at 27:21–23. Tellus, however, failed to present the Court with a specific reason to believe that the depositions would reveal information that was necessary for effective judicial review but could not be gathered from the existing written record. *See Constr. Helicopters*, 169 Fed. Cl. at 111.

The only two cases Tellus cited to support its request were *Pitney Bowes Government Solutions, Inc. v. United States*, 93 Fed. Cl. 327 (2010), and *OTI America, Inc. v. United States*, 73 Fed. Cl. 758 (2006), *aff'd*, 227 F. App'x 926 (Fed. Cir. 2007). Both cases are distinguishable. In *Pitney*, the depositions ordered by the court were needed to develop the plaintiff's allegations

63

of bias and to recreate documents that were improperly destroyed. 93 Fed. Cl. at 334, 336. As noted by the court in that case:

> Where bias is alleged, the administrative record frequently will not be complete or suffice to prove or disprove the allegation. Consequently, to address bias, the court will entertain extrarecord evidence and permit discovery when there has been a strong showing of bad faith or improper behavior such that without discovery the administrative record cannot be trusted.

*Id.* at 332 (quotation omitted). Here, Tellus made no allegation of bias, nor did it argue that the Agency destroyed relevant evidence. Rather, Tellus merely put forth the assertion that the evaluators must have additional insight into the re-evaluation. *See* ECF No. 61 at 6–7. This is not enough to justify ordering depositions, particularly where, as here, evidence demonstrating the nature and extent of the re-evaluation is already included in the AR.

*OTI America* is similarly unhelpful. The court's opinion in that case only mentioned in passing that it had previously permitted deposition testimony "on a limited number of subjects on which the administrative record was silent." *OTI Am.*, 73 Fed. Cl. at 777 n.42. Though Tellus contends that the AR in the instant case is silent on the nature and extent of the re-evaluation, ECF No. 61 at 2–3, the Court disagrees, *see, e.g.*, AR Tab 112 (the SSEB report that explained the re-evaluation process); AR Tab 113 (the SSDD that detailed how the SSA's decision had changed upon re-evaluation). Thus, *OTI America* does not provide support for Tellus's request for depositions. In sum, Tellus failed to demonstrate that this is the rare case where depositions are required to permit effective judicial review. *See Constr. Helicopters*, 169 Fed. Cl. at 111. Accordingly, the Court denied Tellus's Motion to Order Depositions, and in turn, the Motion to Supplement the Administrative Record with deposition transcripts.

The Court deferred ruling on Tellus's Motion to Supplement the Administrative Record with the Burton Declaration, as the Court found it would benefit from considering the parties' merits arguments in ruling on that aspect of the motion. The Court now denies the request. Tellus

64

sought supplementation of the AR with the Burton Declaration to: (1) provide factual evidence of NGA's FAR/NARI violations; (2) "explain[] the prejudice that Tellus experienced" in connection with the Agency's evaluation of Tellus's Past Performance; and (3) "demonstrate[] that there were very relevant performance documents close at hand to NGA during the past performance evaluation." ECF No. 61 at 3–5.  Because the Court rejects Tellus's characterization of the alleged FAR/NARI violations as procurement errors and finds that they fall outside of the Court's protest jurisdiction, there is no need for the Court to determine if the Agency committed such violations. Consequently, the evidence contained in the Burton Declaration is not necessary for effective judicial review of Tellus's Past Performance allegations.  *Axiom*, 564 F.3d at 1381; *see also* ECF No. 78 at 13 (arguing that because Tellus's FAR/NARI allegations are not properly raised in the bid protest forum, "the Burton Declaration, PARs, rebuttals to PARs, and evidence concerning Tellus's disputes with PARs" are "irrelevant and unnecessary for effective judicial review").

To the extent that the Court considered the Burton Declaration when alternatively ruling that Tellus did not suffer prejudice from the Agency's alleged errors, the Burton Declaration is more appropriately considered as part of the Court record and supplementation remains unnecessary.  *See E. W., Inc. v. United States*, 100 Fed. Cl. 53, 57–58 (2011) (considering a plaintiff's submitted declaration as part of the court's record for purposes of determining prejudice); *State of N.C. Bus. Enters. Program v. United States*, 110 Fed. Cl. 354, 362 (2013) (stating that "evidence going to prejudice or prospective relief, if not found in the administrative record, may nonetheless be considered as part of the court's record"); *see also* ECF No. 61 at 5 (alternatively requesting that the Court accept the Burton Declaration and attached exhibits as part of the Court's record).

There is also no need to supplement the AR with the Burton Declaration to resolve Tellus's claim that the Agency failed to consider materials that were too close at hand to ignore.  *See* ECF

No. 61 at 5.  Supplementation of the record, for purposes of the too close at hand doctrine, is only appropriate where the plaintiff alleges that the agency "failed to consider information *relevant* to its final decision."  *MG Altus Apache Co. v. United States*, 102 Fed. Cl. 744, 752 (2012) (emphasis added) (quotation omitted), *supplemented by*, 111 Fed. Cl. 425 (2013).  Because the Court does not find the documents cited by Tellus to be relevant to the Agency's Past Performance evaluation, supplementation of the record is unnecessary.  As a result, the Court denies Tellus's Motion to Supplement the Administrative Record with the Burton Declaration.

> **C.    AP Has Not Demonstrated Prejudicial Error in NGA's Evaluation.**

Similar to Tellus, AP challenges the Agency's evaluation of its proposal under the Past Performance, Risk Assessment – Organizational Structure, and Relevant Experience factors.  *See* ECF No. 64 at 11–41.  Upon review, the Court determines that AP has not demonstrated any prejudicial error in NGA's evaluation.

> **1.    NGA's Evaluation of AP's Past Performance Was Coherently and Reasonably Explained and Did Not Involve Disparate Treatment.**

AP has not demonstrated prejudicial error in the Agency's evaluation of its proposal under the Past Performance factor.[23]  In analyzing a challenge to an agency's past performance evaluation, the Court's role is limited "to review[ing] the past performance rating to ensure it was reasonable and consistent with the solicitation's criteria and applicable law."  *AcmeSolv, LLC v. United States*, 174 Fed. Cl. 748, 755 (2025).  The Court may not "substitute [its] judgment for a reasonably based past performance rating."  *Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 487 (2022) (alteration in original) (quotation omitted).  Although the Court will

---

[23] The Government argues that AP's objections to the Solicitation's Past Performance evaluation methodology are waived under *Blue & Gold*.  *See* ECF No. 79 at 67–73.  As with the similar argument regarding Tellus's protest, *see supra* § III.A.5, the Court need not address the Government's waiver argument because, regardless, the Court has reviewed the parties' arguments on the merits and determined that there was no prejudicial error.

not "automatic[ally] endorse[] [] the agency's actions," *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 126 (2021), it must show "especially great deference to the agency's technical evaluations, past performance ratings, and other 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials,'" *Pro. Analysis, Inc. v. United States*, 177 Fed. Cl. 39, 43 (2025) (quoting *Vanguard*, 101 Fed. Cl. at 780).

AP's challenges to NGA's Past Performance evaluation involve two categories of argument.  First, AP argues that the PPET's evaluations of AP's Projects 1-2, 2-2, and 3-2 were unreasonable, undocumented, and did not evince a consideration of the relevant factors described in the Solicitation.  *See* ECF No. 64 at 11–24.  Second, AP argues that the Agency engaged in disparate treatment in conducting its Past Performance evaluation by failing to evaluate all offerors' submissions equally.  *Id.* at 25–29.  Neither argument meets AP's "heavy burden" to show that NGA's decision lacked a rational basis.  *Impresa*, 238 F.3d at 1333.  The Court takes each argument in turn.

> a.    *The RFP did not require the Agency to validate an overall rating of Exceptional if an offeror had multiple Very Good PPQ ratings.*

AP challenges the Agency's Past Performance evaluation of AP's Projects 1-2, 2-2, and 3-2 as both unreasonable and undocumented.  *See* ECF No. 64 at 15–24.  Upon reviewing NGA's evaluation of AP's Past Performance submissions, the Court finds no error.

Several of AP's Past Performance arguments rest on its contention that the RFP required NGA to give an offeror an overall rating of Exceptional if the offeror had multiple Very Good PPQ ratings.  *See id.* at 14–15.  Rather than evaluating Past Performance in this manner, AP argues that the Agency erred by adopting the most prevalent adjectival rating within each of AP's PPQs.  *Id.* at 15.  In evaluating Past Performance, the PPQ form instructed the POCs to assign ratings across four topical areas (Technical Performance, Management Performance, Cost/Price

67

Performance, and Small Business Participation) with each topical area having between two and six subtopics. *See* AR Tab 16a.3 at 2321–23. The POC was to provide a rating for each subtopic, for a total of 19 ratings. *Id.* The PPQ form also instructed POCs to "provide an assessment rationale to describe the ratings for each topical area," and included boxes for this narrative assessment rationale. *Id.* The PPQ defined adjectival ratings ranging from Unacceptable to Outstanding. *Id.* at 2321. As relevant to AP's protest, the PPQ rating system defined "Very Good" as follows:

- Performance meets contractual requirements and exceeds some to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with some minor problems for which corrective actions taken by the contractor were effective.

- To justify a Very Good rating, identify a significant event and state how it was a benefit to the Government. There should have been no significant weaknesses identified.

*Id.*

The RFP indicated that offerors would be "evaluated on overall ratings earned for each past performance package submitted," using a scale ranging from Adverse to Exceptional. AR Tab 17 at 2471–72. As relevant to AP's protest, an overall rating of "Very Good" was defined as performance that (1) "met contractual requirements and exceeded some, to the Government's benefit" and (2) "was accomplished with some minor problems for which corrective actions taken by the contractor were effective." *Id.* at 2472. "Exceptional" was defined as performance that (1) "met contractual requirements and exceeded many, to the Government's benefit," and (2) "was accomplished with no problems or with few minor problems for which corrective actions taken by the contractor were highly effective." *Id.* For each adjectival rating definition, both elements had to be met for the offeror to receive the corresponding score. *Id.* When reviewing an offeror's past performance, NGA noted that it may use information from other sources. *Id.* at 2471.

68

According to AP, because the PPQ rating of "Very Good" was defined as "[p]erformance meets contractual requirements and exceeds some to the Government's benefit," AR Tab 16a.3 at 2321, each Very Good rating involved at least one instance where the offeror *met and exceeded* contract requirements. *See* ECF No. 64 at 14–15; ECF No. 93 at 7–8. Thus, in AP's view, "[w]hen combined, multiple Very Good ratings" in a PPQ, ECF No. 64 at 14–15, should have warranted an overall Past Performance rating of Exceptional because exceptional past performance was defined as where "[p]erformance *met contractual requirements and exceeded many*, to the Government's benefit," AR Tab 17 at 2472 (emphasis added). AP further argues that NGA failed to conduct this analysis of AP's Past Performance and instead adopted "whichever evaluation rating was most prevalent." ECF No. 64 at 15. The Court finds this to be an overly quantitative and mechanistic reading of the RFP's evaluation criteria.

While AP is correct that the Solicitation required that the PPET consider "how much an offeror exceeded contract requirements to the Government's benefit" in assigning an overall Past Performance rating for a given project, ECF No. 93 at 8, the RFP did not require a quantitative calculation of the number of instances where an offeror exceeded contract requirements. *See* ECF No. 64 at 14. Looking at the broader evaluative scope, the Solicitation required the Agency to qualitatively assess Past Performance by evaluating the "overall ratings earned for each past performance package submitted," taking into consideration the PPQ ratings, POC narrative assessment rationales, and—at NGA's discretion—other information. AR Tab 17 at 2471. Thus, NGA retained discretion to exercise its judgment in evaluating an offeror's overall past performance in a nuanced manner beyond the mere mathematical counting of strengths and weaknesses for which AP advocates.

This qualitative and discretionary understanding of the RFP's Past Performance evaluation methodology is supported by the case law's general treatment of adjectival ratings, as well as the

Agency's express rejection of a strict quantitative analysis in favor of a discretionary assessment. As noted above, the Federal Circuit has rejected the contention that past performance adjectival ratings are "subject to a mathematical calculation" such that they "can be added up" and "averaged out." *Glenn Def. Marine*, 720 F.3d at 909 n.6; *see also Connected Glob. Sols., LLC v. United States*, 162 Fed. Cl. 720, 743 (2022) (explaining that "[l]ooking beyond the adjectival ratings is necessary because proposals with the same adjectival rating are not necessarily of equal quality" (quoting *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 758 (2008))). After all, "[e]valuation of experience and past performance, by its very nature, is subjective." *SOFITC3*, 178 Fed. Cl. at 208 (quoting *Gritter Francona, Inc. v. United States*, 158 Fed. Cl. 597, 608 (2022)).

Moreover, during the procurement's Q&A process, NGA resolved any doubt regarding whether the Solicitation's adjectival ratings were to be assigned through the evaluators' discretion or by mathematical calculation. As noted above with respect to Tellus's protest, when asked to "quantitatively define 'some'" in relation to the Relevant Experience ratings, the Agency responded that "'[s]ome' is less than most, and greater than 'few,'" emphasizing that "[e]valuators will exercise their discretion" in assigning adjectival ratings. AR Tab 14b at 1715. While AP argues that this Q&A does not address the Past Performance adjectival ratings, *see* ECF No. 93 at 8–9, it offers no reason why NGA would have adopted a discretionary approach for the Relevant Experience ratings but not for the Past Performance ratings. Indeed, there is no reason to believe the Agency intended for the term "some" as used in the evaluation of multiple proposal volumes to have different meanings, nor that it intended to give itself discretion in the evaluation of some volumes but not others. *See* AR Tab 14b at 1715 (clarifying in Q&A the definition of "'some' . . . *for the purpose of CLOVER*" (emphasis added)).

Finally, that the Agency considered whether a certain adjectival rating was "predominant" within AP's PPQs does not demonstrate that its evaluation lacked a rational basis. Rather, this

70

was a reasonable consideration in evaluating AP's Past Performance based "on [its] overall rating[] earned." AR Tab 17 at 2471. Accordingly, AP's argument that the Agency failed to consider "how much an offeror exceeded contract requirements to the Government's benefit," ECF No. 93 at 8, is unsupported by the record which demonstrates that the PPET reasonably considered the PPQ responses alongside the POC's narrative assessment rationale in its evaluation of AP's Past Performance. *See* AR Tab 98b at 44606–07, 44610–11, 44613–14.

AP's attempt to convert the Solicitation's discretionary Past Performance evaluation methodology into a quantitative analysis and corresponding argument that NGA's consideration of the most predominant rating in AP's PPQs was inconsistent with the RFP are, therefore, unavailing.

> b.    *NGA coherently and reasonably explained its evaluation of AP's Past Performance under Project 1-2.*

Contrary to AP's assertion, *see* ECF No. 64 at 15–17, 20, the Agency's evaluation of AP's Past Performance for Project 1-2, which involved AP's subcontractor [ . . . ]'s performance of Program Management Support Services for the [ . . . ], *see* AR Tab 21c.17 at 3863, was not inconsistent with the RFP's methodology. This argument rests upon AP's erroneous interpretation of the Solicitation as requiring that the Agency sum up each Very Good PPQ rating to reach an Exceptional rating overall. AP maintains that, "[l]ogically, an aggregation of one Outstanding and fifteen Very Good ratings, absent any documented or cited problems, should have been enough to raise the overall [Past Performance] evaluation rating to Exceptional" for Project 1-2. ECF No. 64 at 20. But, as previously explained, the RFP did not require that NGA mathematically calculate overall Past Performance ratings.

Rather, a review of the Agency's evaluation confirms that it was reasonable and consistent with the Solicitation. NGA found that AP's self-score of 3,000 points (*i.e.*, an Exceptional rating)

71

for Project 1-2 "was not corroborated by a review of the J.19 PPQ" and that instead, "the PPET assessed a rating of 2,000 – Very Good."  AR Tab 98b at 44606.  The evaluators further explained that [ . . . ]'s performance "met contractual requirements and exceeded some, to the Government's benefit . . . with some minor problems for which corrective actions taken by [ . . . ] were effective." *Id.*  In addition, NGA noted that the POC rated [ . . . ]'s "performance predominantly 'Very Good' in Technical, Management, and Cost/Price Performance," while [ . . . ]'s "Small Business Participation Performance was not assessed."  *Id.* at 44607.  The Agency then quoted from the POC's assessment rationale, including that [ . . . ]: (1) "consistently provides high quality and timely deliverables," (2) "do[es] well with providing qualified staff," (3) "consistently meets schedule requirements," (4) "provide[s] critical subject matter expertise," and (5) "effectively manages program costs" with "thorough and timely" financial reporting.  *Id.* (quoting AR Tab 21c.41 at 4002–03).  NGA also noted that the POC explained in its assessment rationale that [ . . . ]'s "Small Business Participation was rated as 'Neutral'" because the contract at issue "is a Service-Disabled Veteran-Owned Small Business (SDVOSB) set aside."[24]  *Id.* (quoting AR Tab 21c.41 at 4003).

Thus, the Agency reviewed the "information from [AP's] proposal submission[]" and rationally determined [ . . . ]'s performance "met contractual requirements and exceeded some, to the Government's benefit . . . with some minor problems for which corrective actions taken . . . were effective."  AR Tab 17 at 2471–72.  AP's "mere disagreement" with NGA's "evaluation judgment[] does not demonstrate that [] judgment[] [was] unreasonable." *SOFITC3*,

---

[24] The Court assumes this means that [ . . . ]'s [ . . . ] contract submitted for Project 1-2 did not include a small business subcontracting plan and that the POC therefore could not positively or negatively assess [ . . . ]'s compliance with such a plan.

178 Fed. Cl. at 208 (quoting *Gritter Francona*, 158 Fed. Cl. at 608); *Croman Corp.*, 724 F.3d at 1363–64.

For similar reasons, the Court rejects AP's argument that the Agency's explanation for its Past Performance evaluation of Project 1-2 was inadequately documented. *See* ECF No. 64 at 16. AP is correct that the PPET's CER largely tracks the Solicitation's definition of Very Good and the POC's assessment rationale. *Id.* (citing AR Tab 98b at 44606–07; AR Tab 21c.41 at 4002–03; AR Tab 17 at 2615–16). AP is incorrect, however, in suggesting that this indicates inadequate documentation of NGA's decision. While the administrative record must adequately support an agency's decision, an "explicit explanation" from the agency "is not necessary . . . where the agency's decisional path is reasonably discernible." *DynCorp*, 10 F.4th at 1313–14 (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998)); *see also NARCORPS Specialties, LLC v. United States*, 177 Fed. Cl. 535, 547 (2025) (similar). Such is the case here.

The Past Performance evaluation report indicates the Agency reviewed the PPQ ratings and the POC's assessment rationale, which included comments indicating [ . . . ] "met contractual requirements and exceeded some." AR Tab 98b at 44606; *see, e.g.*, *id.* at 44607 (noting that the POC indicated [ . . . ] "has done well with providing qualified staff with highly technical and low-density skills across a broad range of [labor categories]," "provide[s] critical subject matter expertise," and "effectively manages program costs and hours management" (quoting AR Tab 21c.41 at 4002)). The PPQ ratings and the POC's assessment rationale also demonstrate that [ . . . ] met, but did not exceed, contract requirements for several of the topics or sub-topics being evaluated. *See, e.g.*, AR Tab 21c.41 at 4002 (indicating "[ . . . ] consistently meets schedule requirements"). This is consistently reflected in the PPET's analysis. *See* AR Tab 98b at 44606–07. From these responses, NGA's overall conclusion that [ . . . ]'s performance "met contractual

73

requirements and exceeded some, to the Government's benefit . . . with some minor problems" is reasonably discernible. *Id.* at 44606; *see also DynCorp*, 10 F.4th at 1313–14.

The cases AP cites in support of its inadequate documentation argument are inapposite. AP first cites *FFL Pro LLC v. United States*, 124 Fed. Cl. 536, 556 (2015), where a judge of this court found that the agency's evaluation of an offeror's past performance did "not evince a consideration of relevant factors" because the narrative summary supporting its "exceptional rating [was] little more than a copy-and-paste of the solicitation's definition of 'exceptional.'" Here, however, the Agency did not merely copy-and-paste the RFP's definition of Very Good. *See generally* AR Tab 98b at 44606–07. Instead, NGA also documented its review of the PPQ ratings and POC's assessment rationales, allowing the Court to reasonably discern its decisional path for assigning a Very Good rating. *Id.* (citing AR Tab 21c.41 at 4002–03). AP's reliance on *FFL Pro* is, therefore, unavailing. AP also relies on *Wackenhut Services, Inc. v. United States*, 85 Fed. Cl. 273, 297 (2008), where another judge of this court held that the agency "fail[ed] to create a record" justifying its changes to an offeror's score between its preliminary and final findings. In that case, however, the judge found "[t]here [was] not a word . . . justify[ing] why that increase happened." *Id.* Conversely, here, the Agency explained why it was unable to verify AP's self-score of Exceptional and instead evaluated AP's overall rating as Very Good. *See* AR Tab 98b at 44606–07. Accordingly, the Court rejects AP's contention that NGA inadequately explained its Past Performance evaluation of AP's Project 1-2.

Finally, AP argues that the Agency failed to consider the Project 1-2 SOW, which AP included in Volume 2 – Relevant Experience. *See* ECF No. 64 at 17–20 (citing AR Tab 21b.31). The Government responds by arguing that the RFP gave NGA discretion to consider outside information in evaluating Past Performance, but it did not require it to do so. *See* ECF No. 79 at 75 & n.21 (citing AR Tab 17 at 2459). It also acknowledges that the Solicitation required the

PPET to consider "information provided by Offerors in response to this solicitation," but appears to argue that this requirement was limited to the PPQs and other information included in an offeror's Volume 3 – Past Performance. *Id.* at 75 (quoting AR Tab 17 at 2459). AP did not respond to this argument. *See generally* ECF No. 93.

Given that AP bears the burden of establishing that the Agency's decision lacked a rational basis, the Court cannot conclude that the RFP required NGA to consider the Project 1-2 SOW included in AP's Relevant Experience volume when evaluating AP's Past Performance. *See Impresa*, 238 F.3d at 1333 (emphasizing the protester's "heavy burden" of demonstrating the award decision lacked a rational basis); *Knox v. Dep't of Just.*, 125 F.4th 1059, 1067 (Fed. Cir. 2025) (finding party "forfeited [an] argument by failing to present anything more than an underdeveloped, skeletal argument" (citing *In re Killian*, 45 F.4th 1373, 1385–86 (Fed. Cir. 2022)). The Court agrees with the Government that the Solicitation did not plainly require such a review. The RFP indicated that, in evaluating Past Performance, the Agency would consider "information from the Offeror's proposal submissions," AR Tab 17 at 2471, which could arguably be read to suggest that the PPET would consider information contained in any volume of an offeror's proposal. However, the RFP stated that NGA would evaluate "overall ratings earned *for each past performance package submitted*" in Volume 3, *id.* (emphasis added), clearly indicating that the review would be limited to the Past Performance volume. Additionally, the RFP instructions required that the Past Performance volume "include enough detail of the work previously performed for the Government to assess how closely the work aligns with the requirements of the CLOVER program." *Id.* at 2458. If AP believed the Project 1-2 SOW demonstrated close alignment with the requirements of the CLOVER program and that [ . . . ]'s performance exceeded contract requirements, it should have included the SOW in the Past Performance volume. Generally, while "[a]gencies must indeed review the whole proposal, [] they

75

are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal." *Warrior Focused Sols., LLC v. United States*, 175 Fed. Cl. 416, 431 (2025) (quoting *CACI, Inc.-Fed. v. United States*, 158 Fed. Cl. 1, 19 (2021), *vacated on other grounds*, 67 F.4th 1145 (Fed. Cir. 2023)).

Overall, the Court finds that NGA's evaluation of AP's Past Performance for Project 1-2 constituted a reasonable exercise of the Agency's discretion consistent with the Solicitation's evaluation methodology and was adequately explained in the PPET's CER.

       *c.*       *The Agency coherently and reasonably explained its evaluation of AP's Past Performance under Projects 2-2 and 3-2.*

AP's challenges to the Agency's Past Performance evaluation of AP's Projects 2-2 and 3-2 are similarly unavailing. Projects 2-2 and 3-2 both involved AP's subcontractor [ . . . ]'s performance of Business Operations services for the [ . . . ]. *See* AR Tab 21c.19 at 3868; AR Tab 21c.20 at 3871. AP again argues that NGA failed to aggregate multiple Very Good PPQ ratings to reach an Exceptional overall rating and instead based its overall rating on the most prevalent PPQ rating. ECF No. 64 at 20–23. But, again, this argument rests upon AP's erroneous mathematical interpretation of the RFP's evaluation methodology. *See supra* § III.C.1.a.

Consistent with the qualitative methodology provided in the Solicitation, the PPET's CER reflects that the Agency properly evaluated whether the PPQ ratings and the POC's assessment rationales, overall, supported AP's self-score. *See* AR Tab 98b at 44610–11, 44613–14. For example, in evaluating Project 2-2, the evaluators explained that AP's self-score of 3,000 points, which equates to an Exceptional rating, was "not validated because the [POC] rated [ . . . ]'s performance [as] 'Very Good' in Technical, Management, and Cost/Price Performance," while assessing "Small Business Participation Performance . . . as 'Acceptable.'" *Id.* at 44610. NGA supported this conclusion with quotes from the POC's assessment rationales, including that [ . . . ]:

(1) "met most contract standards and exceeded some of them," (2) "delivered [products] with no or minimal errors," (3) "seamlessly integrated" personnel," (4) was "very responsive to any concerns from stakeholders," (5) "ensured a strong continuity of operations," and (6) was "consistent in forecasting [its] planned accruals." *Id.* at 44610 (quoting AR Tab 21c.44 at 4026–27). Finally, the PPET observed the POC's notation that [ . . . ] "exceed[ed] the commitment established in the Small Business Participation Plan," but did not "reach[] the goal . . . necessary to earn a higher rating." *Id.* at 44611 (quoting AR Tab 21c.44 at 4027). The evaluators' analysis of AP's submission for Project 3-2 was similar. *See id.* at 44613–14 (citing AR 21c.47 at 4050–51). In both instances, NGA evaluated AP's Past Performance consistent with the RFP's methodology and reasonably explained a rational basis for the assigned overall rating.

AP also challenges the Agency's evaluation of Projects 2-2 and 3-2 as inadequately documented. *See* ECF No. 64 at 22 (arguing that "[t]he PPET's evaluation of [Projects] 2-2 and 3-2 . . . amounted to nothing more than a restatement of the RFP's evaluation definition of a Very Good rating coupled with a cut and paste of the Government POC's . . . PPQ narrative statement"). As with Project 1-2, the Court can reasonably discern NGA's decisional path for its Past Performance ratings for Projects 2-2 and 3-2. The evaluators considered the PPQ ratings and the POC's assessment rationales, which reflected a variety of instances where [ . . . ] met requirements, exceeded requirements, and in at least two instances encountered minor problems in performing. *See, e.g.*, AR Tab 98b at 44610–11 (indicating [ . . . ]'s "performance met most contract standards and exceeded some of them with regard to the overall quality of products, services, and support" as "[p]roducts were delivered with no or minimal errors," but [ . . . ] did "not reach[] the [Small Business] goal [] necessary to earn a higher rating" (quoting AR Tab 21c.44 at 4026–27)); *id.* at 44610 (noting that the POC rated [ . . . ]'s "Small Business Participation Performance . . . as 'Acceptable'"). Based on these facts, the PPET concluded that [ . . . ]'s performance "met

contractual requirements and exceeded some . . . with no problems or with few minor problems for which corrective actions taken by [ . . . ] were effective." *Id.* at 44610.  The Court finds that this demonstrates a reasonably discernible decisional path, and that path provides a rational connection between the facts provided by the POC in the PPQ and the choice made by the evaluators.  *See DynCorp*, 10 F.4th at 1313–14; *NARCORPS*, 177 Fed. Cl. at 547.  Accordingly, NGA's evaluation of AP's Past Performance for Projects 2-2 and 3-2 was both rational and adequately documented.

This conclusion is not disturbed by the fact that the Agency did not explicitly describe how a "Kudos" document that [ . . . ] received during performance of Project 2-2 factored into its analysis.  AP argues that NGA failed to explain how this document, reflecting "multiple [] instances in which [ . . . ] exceeded requirements," ECF No. 64 at 24 (citing AR Tab 21c.14), impacted the Agency's overall rating, ECF No. 93 at 12 n.7 (citing *FFL Pro*, 124 Fed. Cl. at 556–57).[25]  The fact that the CER does not explicitly mention how this particular document factored into its otherwise rational analysis does not render the Agency's explanation inadequate nor its judgment unreasonable.  As the Circuit has acknowledged, the APA "does not require an agency to 'address every argument raised by a party or explain every possible reason supporting its conclusion.'"  *Regents of the Univ. of Cal. v. Broad Inst., Inc.*, 136 F.4th 1367, 1384 (Fed. Cir. 2025) (quoting *Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1322 (Fed. Cir. 2016), *overruled on other grounds by Aqua Prods., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (en banc)).

Accordingly, the Agency's Past Performance evaluation of AP's Projects 2-2 and 3-2 was rational and adequately documented.

---

[25] Unlike the Project 1-2 SOW, the "Kudos" document was submitted as part of AP's Past Performance volume.  *See* AR Tab 21c.14.

        d.      *NGA's evaluation of AP's Past Performance did not constitute disparate treatment.*

In addition to arguing that the Agency's Past Performance evaluation was unreasonable and undocumented, AP claims that the evaluation constituted disparate treatment because NGA did not evaluate all offerors' submissions equally. *See* ECF No. 64 at 25–29. Specifically, AP contends that its PPQ ratings for Projects 1-2, 2-2, and 3-2 were substantively indistinguishable from Exacta's and Logic Gate's PPQ ratings but Exacta received a higher overall rating of Exceptional and Logic Gate received the same overall Very Good rating despite having worse narrative comments. *See id.*; ECF No. 93 at 13–19. This argument fails because AP has not established that its proposal was "substantively indistinguishable" from either Exacta's or Logic Gate's, or that NGA "inconsistently applied objective solicitation requirements." *Off. Design Grp.*, 951 F.3d at 1372.

To prevail on a disparate treatment claim, a protester must show that "the agency unreasonably downgraded [the protester's] proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals," and that such "unequal treatment was prejudicial." *Id.* at 1372–73. A protester "may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Id.* at 1372. Thus, application of the disparate treatment standard requires that the Court first look to the Solicitation to determine what constitutes a "deficiency" and whether any unequal treatment was prejudicial. *See id.* at 1373 (comparing offerors' proposals to the solicitation's requirements to determine substantive indistinguishability in responses to the requirements); *id.* at 1374 (reviewing the solicitation's evaluation methodology to determine that unequal treatment was not prejudicial). Where a solicitation contemplates that the procuring agency will exercise its discretion, the Court

may not second guess that discretionary judgment under the guise of disparate treatment. *See Jacobs Eng'g Grp., Inc. v. United States*, 177 Fed. Cl. 754, 775–76 (2025) (finding proposals were not substantively indistinguishable where the agency exercised discretion in determining that distinctions between the proposals warranted different ratings (citing *E.W. Bliss*, 77 F.3d at 449)); *Onésimus Def. LLC v. United* States, 173 Fed. Cl. 344, 356 (2024) (finding the agency "consistently evaluated [the offerors'] Past Performance references, considering both the scope and magnitude of each").

Here, the Solicitation's evaluation methodology did not require that NGA treat two proposals identically if the two proposals had similar, or even identical, PPQ ratings. Instead, the RFP required the Agency to evaluate each offeror's "overall rating[]," taking into consideration the PPQ ratings, assessment rationale, and—at the Agency's discretion—other information. AR Tab 17 at 2471. Thus, for purposes of the Past Performance evaluation, two proposals were not substantively indistinguishable merely because they had similar PPQ ratings.

Even comparing the proposals directly, AP has not established that its proposal and Exacta's proposal were substantively indistinguishable. AP contends that NGA engaged in disparate treatment by rating Exacta's Past Performance for Projects 1-2, 2-2, and 3-2 as Exceptional even though Exacta's PPQ ratings for these projects were all "predominantly Very Good." ECF No. 64 at 25–26 (citing AR 25c.26 at 18133–34; AR Tab 25c.30 at 18165–66; AR Tab 25c.34 at 18197–98). AP argues that Exacta's narrative assessment rationales were "less than glowing" and that AP received a "much more glowing narrative write-up." *Id.* Thus, it concedes (albeit in attempting to make its point) that the respective narrative comments were not substantively indistinguishable. This is fatal to AP's disparate treatment claim, at least as it relates to Exacta, because NGA was required to consider these narrative comments in assigning its overall rating. *See* AR Tab 17 at 2471. Moreover, AP's argument is factually inaccurate because the

80

Agency's evaluation of Exacta's projects was not based solely on the PPQs. Instead, NGA reasonably exercised its discretion to follow-up with Exacta's POC and obtain additional information because it identified a gap between the PPQ ratings and narrative comments. *See* AR Tab 17 at 2471 (indicating that the PPET may reach out to the provided POC to corroborate the information within an offeror's PPQ); *see also, e.g.*, AR Tab 102b at 44926 (indicating NGA's assessment of Exacta's Past Performance for Project 1-2 was based in part on "email correspondence and a telephonic interview" with Exacta's POC); AR Tab 25c.25 at 18122–26 (documenting correspondence between the evaluators and Exacta's POC).

Indeed, the record reflects that the PPET reasonably determined that the information it obtained through follow-up correspondence with Exacta's POC validated Exacta's self-score of Exceptional while AP's PPQ ratings and narrative comments did not validate its self-score. AR Tab 102b at 44926, 44928, 44930–31; AR Tab 98b at 44606–07, 44610–11, 44613–14. By way of example, for Exacta's Project 1-2, NGA described how the POC "emphasized that [ . . . ] [] was overall Outstanding and exceeded expectations . . . by hiring staff that exceed the required qualifications, proactively managing staff performance issues, [and] maintaining strong communications with the [Government POC] on potential issues and their mitigation strategy." AR Tab 102b at 44926. Conversely, the Agency found that AP's self-score of Exceptional for Projects 2-2 and 3-2 was not validated because the POC rated [ . . . ]'s "performance 'Very Good' in Technical, Management and Cost/Price Performance" while assessing "Small Business Participation Performance . . . as 'Acceptable.'" AR Tab 98b at 44610, 44614. The PPET also considered the POC's statement that [ . . . ]'s "performance met most contract standards and exceeded some of them," which further supported an overall rating of Very Good. *Id.* (quoting AR Tab 21c.44 at 4026; AR Tab 21c.47 at 4050). In sum, both because Exacta's and AP's PPQs included differing assessment rationales and because the Agency's assessment of Exacta's

proposal also incorporated additional information from the POC, the submissions were not substantively indistinguishable.  The Court will not, therefore, "second-guess the agency's discretionary determinations" or wade into the "minutiae of the procurement process." *Off. Design Grp.*, 951 F.3d at 1373 (first citing and then quoting *E.W. Bliss*, 77 F.3d at 449).  Rather, the AR indicates that the PPET rationally considered the information before it, including the follow-up communications with Exacta's POC, and reasonably assigned Exacta's projects an overall Exceptional rating and AP's projects an overall Very Good rating.

Nor has AP demonstrated that NGA's decision to seek out more information about the PPQ ratings for Exacta and not AP constitutes "procedural disparate treatment."  ECF No. 93 at 17; *see also* ECF No. 64 at 26–27.  Setting aside the fact that the term "procedural disparate treatment" is found nowhere in the case law, the RFP gave the Agency discretion to follow up with an offeror's POC but did not require that the evaluators do so in every instance.  *See* AR Tab 17 at 2471 (stating NGA "may use data obtained from other sources" including "customer interviews").  The Agency reasonably exercised its discretion in seeking more information regarding Exacta's PPQ responses.  Exacta's PPQ ratings for Projects 1-2, 2-2, and 3-2 were all Very Good but, for many of the assessment rationales, the POC merely stated that Exacta's partner [ . . . ] "met all requirements."  AR Tab 25c.26 at 18133–34; AR Tab 25c.30 at 18165–66; AR Tab 25c.34 at 18197–98.  The PPET found these assessment rationales, standing alone, did not fully corroborate a Very Good PPQ rating, which required that the offeror "exceed[]" at least "some" contract requirements.  AR Tab 16a.3 at 2321.  The evaluators therefore reached out to Exacta's POC to ask about the discrepancies between the assessment rationales and the assigned PPQ ratings.  *See* AR Tab 25c.25 at 18123 ("When you say 'met contractual requirements' that suggests Satisfactory performance to me.  Yet you scored them 'Very Good' on the three submitted PPQs.  Can you elaborate what you intend to say?").  Thus, the Court can reasonably discern that the Agency could not understand

Exacta's PPQ ratings based on the assessment rationales alone and reached out to the POC to seek clarification, as was within its discretion under the RFP.[26]  AR Tab 17 at 2471; *DynCorp*, 10 F.4th at 1313–14; *NARCORPS*, 177 Fed. Cl. at 547.

Conversely, the AR indicates that, in reviewing AP's PPQ ratings for these same projects alongside the POCs' assessment rationales, NGA determined that the PPQ responses, overall, reflected a rating of Very Good.  AR Tab 98b at 44606–07, 44610–11, 44613–14.  Accordingly, the Agency did not elect to follow up with AP's POCs for these projects because, unlike with Exacta, there was no gap between AP's PPQ ratings and narrative responses.  *See, e.g.*, *id.* at 44606 (indicating the PPET determined AP's self-score for Project 1-2 "was not corroborated by a review of the J.19 PPQ completed by the [POC]" and instead supported an overall rating of Very Good "[b]ased on [its] analysis of the information provided").  This was a reasonable exercise of NGA's discretion under the RFP and thus does not amount to disparate treatment.  *Onésimus*, 173 Fed. Cl. at 356; *see also Allicent Tech.*, 166 Fed. Cl. at 110 (indicating that "it is not disparate treatment for the Agency to evaluate different proposals differently").

Further, AP cannot establish that NGA's evaluation of AP's and Logic Gate's proposals constitutes disparate treatment.  As an initial matter, AP claims that the record does not support the PPET's overall rating of Very Good for Logic Gate's Past Performance for Projects 1-2, 2-2,

---

[26] AP's accusation that NGA "coached the Government POC to provide [the evaluators] with certain information to justify [Exacta's] higher scores," ECF No. 93 at 17–18 (citing AR 25c.25), is unsupported by the record.  Instead, the email correspondence indicates that the PPET identified a gap between the POC's assigned PPQ ratings and narrative assessment rationales and followed up to clarify that discrepancy.  AR Tab 25c.25 at 18123.  Accordingly, AP cannot meet the "well-nigh irrefragable proof" standard required to overcome "[t]he presumption that government officials act in good faith." *Croman Corp.*, 724 F.3d at 1364 (quotation omitted); *see also, e.g.*, *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 329 (2015) (treating claim that agency attempted "to find a way to award the contract" to a specific party as an allegation of bad faith); *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 220 (2011) (treating statement that agency intended "to steer the award" to a specific offeror as an allegation that it did not act in good faith); *Syneren Techs.*, 166 F.4th at 1046.

and 3-2 because the PPQ ratings and follow-up correspondence with the POC indicate that [ . . . ], a [ . . . ] of one member of the Logic Gate joint venture, *see* AR Tab 27a.2 at 19789, only met "some" contract requirements and never fully staffed the contracts. *See* ECF No. 64 at 27–28 (citing AR Tab 27c.23 at 24815–16; AR Tab 27c.25 at 24829–30; AR Tab 27c.26 at 24836–37; AR Tab 27c.32 at 24854). In AP's view, this meant that Logic Gate's submission could not meet the definition of a Very Good rating under the RFP because [ . . . ] failed to meet contractual requirements and did not correct deficiencies. *Id.* According to AP, Logic Gate should have instead received a Marginal rating as [ . . . ]'s performance "did not meet some contractual requirements" and "ha[d] not yet identified corrective actions" for a "serious problem." *Id.* at 28 (emphases omitted) (quoting AR Tab 17 at 2616).

For these projects, the PPET found that Logic Gate's self-score of 3,000 points, which equates to an Exceptional rating, was "not corroborated by review of the J.19 PPQ submitted by the [POC], and follow-up emails and telephone conversations." *E.g.*, AR Tab 104b at 45101. The evaluators instead assessed a rating of Very Good because "performance met contractual requirements and exceeded some . . . with no problems or with few minor problems for which corrective actions taken . . . were effective." *Id.* The CER quoted from the follow-up correspondence with the POC, noting that "[ . . . ]," but that following a meeting to discuss the invoice issues, the "concerns slowly improved." *Id.* (quoting AR Tab 27c.32 at 24854). NGA further observed that the POC reported "problems [with] managing their sub-contractors['] hours," but once [ . . . ] discovered that some [ . . . ]." *Id.* As another example, the Agency explained that the POC described "[o]ne task order [with] many areas of concern, in which [the parties] began meeting regularly to try to resolve the issues." *Id.* This resulted in "[s]ome issues [being] resolved" through "[ . . . ]." *Id.* NGA's evaluations of Logic Gate's Projects 2-2 and 3-2 were similar. *See id.* at 45104–05, 45107–08.

Thus, the record shows that the Agency considered the arguably negative comments that AP points to and ultimately determined that those instances fit within the Very Good rating's definition of "few minor problems for which corrective actions taken by the contractor were effective." *Id.* at 45101. AP's subjective characterization of these references as indicating that [ . . . ]'s performance failed to "meet some contractual requirements" and "reflect[ed] [] serious problem[s] for which the contractor has not yet identified corrective actions," ECF No. 64 at 28 (emphases omitted) (quoting AR Tab 17 at 2616), reflects AP's "mere disagreement" with an otherwise reasonable exercise of agency discretion. *Croman Corp.*, 724 F.3d at 1363–64; *SOFITC3*, 178 Fed. Cl. at 208 (quoting *Gritter Francona*, 158 Fed. Cl. at 608). The Court must defer to NGA's reasonable judgment that the narrative comments AP cites appropriately corresponded with the definition of a Very Good rating. AP has not, therefore, demonstrated that NGA's evaluation of Logic Gate's Past Performance for Projects 1-2, 2-2, and 3-2 was unsupported by the record.

AP's attempt to show that the Agency unequally evaluated AP's and Logic Gate's proposals fares no better. AP argues that the PPET erred in assigning both AP and Logic Gate a rating of Very Good for Projects 1-2, 2-2, and 3-2 because, in AP's view, Logic Gate's proposal was "objectively worse." ECF No. 93 at 18 (citing AR Tab 27c.23 at 24815–16; AR Tab 27c.25 at 24829–30; AR Tab 27c.26 at 24836–37). Importantly, AP concedes (again, in attempting to make its point) that its proposal was distinguishable from Logic Gate's. *Id.* at 19 (arguing that "NGA determined that the two proposals were substantially indistinguishable when objectively they were not"). Thus, the only basis under which AP could establish disparate treatment of its and Logic Gate's Past Performance submissions is if the Agency "inconsistently applied objective solicitation requirements between it and other offerors." *Off. Design Grp.*, 951 F.3d at 1372. While AP argues that its proposal was "objectively" better than Logic Gate's, ECF No. 93 at 18,

85

AP does not identify any objective solicitation requirement that NGA applied inconsistently. Rather, AP's characterization of its proposal as better than Logic Gate's simply reflects "mere disagreement" with the PPET's reasonable exercise of discretion in evaluating each proposal as Very Good. *Croman Corp.*, 724 F.3d at 1363–64; *SOFITC3*, 178 Fed. Cl. at 208. The Federal Circuit's narrow definition of disparate treatment prevents the Court from second guessing a procuring agency's reasonable discretionary judgments. *See Off. Design Grp.*, 951 F.3d at 1372–73; *Onésimus*, 173 Fed. Cl. at 356–57 (emphasizing that a court "will not second guess" an agency's reasonable judgment on the basis of "[m]ere disagreement" (alteration in original) (quotation omitted)). Accordingly, AP has not established that the Agency inconsistently applied objective solicitation requirements in evaluating AP's and Logic Gate's Past Performance proposals.

Perhaps recognizing that its disparate treatment claim regarding Logic Gate does not fit within the binding standard articulated by the Federal Circuit in *Office Design Group*, AP cites *FreeAlliance.com, LLC v. United States*, 173 Fed. Cl. 598, 608 (2024). *See* ECF No. 93 at 18–19. In *FreeAlliance*, another judge of this court granted a protester leave to amend its complaint to include a disparate treatment claim alleging that the agency improperly required some offerors to offset weaknesses with strengths, notwithstanding the Government's objection that such an amendment would be futile. 173 Fed. Cl. at 608. While *FreeAlliance* supports the general proposition that the facts alleged *could* constitute disparate treatment, its holding is limited to the pleadings stage. *Id.* ("Today's ruling merely confirms that [the protester] has made a plausible allegation of disparate treatment in its proposed amended complaint sufficient to defeat a futility challenge."). Unlike in *FreeAlliance*, here, NGA did not require AP to offset weaknesses with strengths while failing to hold Logic Gate to the same standard, and this case is at the merits—rather than pleadings—stage. Thus, *FreeAlliance* does little to advance AP's argument.

Finally, the Court observes that even under AP's theory of disparate treatment, which focuses on whether the offerors' PPQ ratings were substantively indistinguishable, AP cannot prevail because its PPQ ratings were not substantively indistinguishable from Exacta's and Logic Gate's ratings. For Project 1-2, AP received one Outstanding rating, one Acceptable rating, two Neutral ratings, and 15 Very Good ratings, AR Tab 21c.41 at 4002–03; while Exacta received 19 Very Good ratings, AR Tab 25c.26 at 18133–34; and Logic Gate received one Acceptable rating and 18 Very Good ratings, AR Tab 27c.23 at 24815–16. For Project 2-2, AP received two Acceptable ratings and 17 Very Good ratings, AR Tab 21c.44 at 4026–27; whereas Exacta again received 19 Very Good ratings, AR Tab 25c.30 at 18165–66; and Logic Gate received four Acceptable ratings and 15 Very Good ratings, AR Tab 27c.25 at 24829–30. For Project 3-2, AP received two Acceptable ratings and 17 Very Good ratings, AR Tab 21c.47 at 4050–51; while Exacta received 19 Very Good ratings, AR Tab 25c.34 at 18197–98; and Logic Gate received five Acceptable ratings and 15 Very Good ratings, AR Tab 27c.26 at 24836–37.[27] Thus, even the PPQ ratings were not substantively indistinguishable.

This is true even if the Court looks to, as AP suggests the Government did, the predominant PPQ rating. *See* ECF No. 93 at 14 & n.10. AP still has not established disparate treatment because Exacta's three projects all received entirely Very Good ratings, AR Tab 25c.26 at 18133–34; AR Tab 25c.30 at 18165–66; AR Tab 25c.34 at 18197–98, which is not the same thing as a Very Good rating being "predominant." As AP concedes, the standard is whether the proposals are "indistinguishable for purposes of the evaluation." ECF No. 93 at 14 n.10 (quoting *Enhanced Veteran Sols.*, 131 Fed. Cl. at 588). Under the RFP, it was entirely reasonable for NGA to treat a

---

[27] It appears that Logic Gate's POC assigned one subtopic, "[e]ffective risk mitigation actions implemented in a timely manner," both a Very Good and an Acceptable rating, leading to 20 total PPQ ratings, rather than 19. AR Tab 27c.26 at 24836.

project that received all Very Good ratings on the PPQ different from one that received a "predominant" number of Very Good PPQ ratings, alongside one or more Acceptable ratings. *Compare* AR Tab 16a.3 at 2321 (defining "Very Good" as where "[p]erformance meets contractual requirements *and exceeds some* . . . with some minor problems for which corrective actions taken . . . were *effective*" (emphases added)), *with id.* (defining "Acceptable" as where "[p]erformance meets contractual requirements" and "contains some minor problems for which corrective actions taken . . . appear or were *satisfactory*" (emphases added)).  After all, "it is not disparate treatment for the Agency to evaluate different proposals differently." *Allicent Tech.*, 166 Fed. Cl. at 110.  If anything, Logic Gate, like AP, received predominantly Very Good PPQ ratings. *See* AR Tab 27c.23 at 24815–16; AR Tab 27c.25 at 24829–30; AR Tab 27c.26 at 24836–37.  AP's and Logic Gate's projects received the same Very Good overall rating confirming that, even under AP's version of the disparate treatment standard, the Agency treated like proposals alike.  *See* AR Tab 104b at 45100–01, 45104–05, 45107–08.

Accordingly, the PPET's evaluation of AP's Past Performance was coherently and reasonably explained, reflected a reasonable exercise of the Agency's discretion, and did not amount to disparate treatment.

2. The Agency's Evaluation of AP's Proposal Under the Risk Assessment – Organizational Structure Factor Was Rational and Did Not Apply Unstated Evaluation Criteria.

AP's challenge to the RAET's evaluation of AP's proposal under the Risk Assessment – Organizational Structure factor likewise fails to show that the Agency's decision lacked a rational basis.  AP argues that NGA applied unstated evaluation criteria in verifying AP's previous performance with its subcontractors. *See* ECF No. 64 at 30–31; ECF No. 93 at 19–20.  AP cannot, however, establish that the Agency used a significantly different basis in evaluating its proposal than was described in the Solicitation.  *See Poplar Point RBBR, LLC v. United States* (*Poplar*

88

*Point II*), 147 Fed. Cl. 201, 219 (2020).  Instead, the Court concludes that the RAET's evaluation was consistent with the RFP and did not exceed NGA's discretion.

A protester may demonstrate that an agency's procurement decision is arbitrary and capricious by establishing that the agency applied an unstated evaluation criterion.  *See Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024) ("An agency must evaluate proposals and make awards based on the criteria stated in the solicitation." (citing *Poplar Point II*, 147 Fed. Cl. at 219)).  To succeed on a claim of unstated evaluation criteria, a protester "must show that the procuring agency used a 'significantly different basis in evaluating the proposals than was disclosed' in the solicitation."  *Poplar Point II*, 147 Fed. Cl. at 219 (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536–37 (2010)).  Although an agency has "great discretion in determining the scope of an evaluation factor" and need not identify with specificity intrinsic elements to be considered under stated evaluation factors, "an agency's discretion to conduct its technical evaluation is not without its limits."  *Samsara*, 169 Fed. Cl. at 319 (quoting *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009)).

As explained, to validate an offeror's self-score for the Risk Assessment – Organizational Structure factor, the RFP required that offerors provide sufficient documentation for the Agency to verify the offeror's claimed working partnership with no page limit for what offerors could submit.  AR Tab 17 at 2448, 2463–64.  AP claimed 2,000 points for the Risk Assessment – Organizational Structure factor on the basis that it had previously performed with at least 60 percent of its proposed subcontractors.  *See* AR Tab 21e.4.  To validate its claimed previous performance with subcontractors [ . . . ] and [ . . . ], AP submitted a modification exercising an option year under an IDIQ subcontract with each subcontractor.  AR Tabs 21f.8–9.  The RAET found that the subcontract modifications that AP submitted "[did] not demonstrate that work was performed," and it deducted 1,000 points from AP's self-score on that basis.  *See* AR Tab 98d at

89

44625. NGA explained that because "there is no supporting documentation that demonstrates work was accomplished, even while the Government recognizes that there was a subcontract, this does not clearly demonstrate that [AP] has previously performed in a business arrangement with [[ . . . ] and [ . . . ]]." *Id.* at 44626.

AP argues that the Agency's finding of a lack of documentation "allotting dollars or positions between the two organizations," constituted an unstated evaluation criterion because it went beyond the RFP's requirement that offerors provide documentation that clearly represents a "working partnership." ECF No. 64 at 31 (quoting AR Tab 98d at 44625–26). This argument misconstrues NGA's evaluation of AP's proposal. The evaluators did not require an allocation of dollars or positions in order to validate AP's self-score but instead identified such an allocation as one potential example of evidence of work actually performed. *See* AR Tab 98d at 44625 ("There is no documentation that demonstrates that work was actually performed, *such as* a contract allotting dollars or positions between the two organizations." (emphasis added)). Put differently, while the Agency found that documentation allotting dollars or positions between AP and its subcontractors would have been sufficient to establish that work was performed, NGA did not find it was required to do so. Thus, the Agency did not apply an unstated evaluation criterion.

More generally, the RAET did not hold AP to a higher standard than what the RFP required. To verify AP's self-score, the Solicitation required that AP demonstrate it had performed work on a contract or task order with at least 60 percent of its proposed first-tier subcontractors. AR Tab 17 at 2463–64, 2475–76. NGA rationally determined it could not verify AP's self-score because the IDIQ subcontract extensions did not demonstrate that any work was actually performed. *See* AR Tab 98d at 44625–26. The Agency did not deduct points from AP's self-score for anything beyond what the RFP required, as the documents AP provided did not include any documentation of work performed by the parties pursuant to the IDIQ subcontracts, such as task orders issued

90

under them.[28]  *See* AR Tabs 21f.8–9.  Accordingly, AP has not met its burden of demonstrating that NGA evaluated AP's proposal on a "significantly different basis . . . than was disclosed." *Poplar Point II*, 147 Fed. Cl. at 219 (quotation omitted).

AP counters that the IDIQ subcontract modifications it submitted could not exist unless AP had existing relationships with [ . . . ] and [ . . . ].  *See* ECF No. 93 at 20.  But this argument misinterprets the Solicitation's requirement.   The RFP required "documentation clearly represent[ing] the *working* partnership," not the mere existence of a prior business relationship. AR Tab 17 at 2464 (emphasis added); *see also id.* at 2475 (indicating that "[s]coring for this element is only available for demonstrating that the Offeror has previously performed in the proposed business arrangement").  Indeed, the evaluators expressly "recognize[d] that there was a subcontract," but found that the existence of an IDIQ subcontract alone "does not clearly demonstrate" previous performance.  AR Tab 98d at 44626.  Moreover, the RAET's role was to *verify* previous performance based on the documents provided, not to make inferences on the part of the offeror.  *See* AR Tab 17 at 2464, 2475.  And the RFP put the risk of the RAET's inability to verify an offeror's documentation on the offeror.  *See id.* at 2464.  At bottom, the Court cannot conclude that the Agency abused its discretion in finding that it could not verify a working partnership based on these documents.  *Samsara*, 169 Fed. Cl. at 319.  The RAET's evaluation, therefore, did not apply unstated evaluation criteria and did not otherwise constitute an abuse of discretion.

---

[28] The Court acknowledges that the signature block of the modification of the IDIQ subcontract with [ . . . ] indicates that the parties "executed this Task Order award on the dates shown below," but the body of the document indicates that it extends the "IDIQ Section 9, Subcontract Ordering Period" for "Option Year 1."  AR Tab 21f.8 at 4176–77.  Thus, the Court cannot conclude that the Agency erred in finding that this document did not represent that work was actually performed.

3.    NGA's Evaluation of AP's Relevant Experience Was Coherently and Reasonably Explained and Did Not Involve Disparate Treatment.

Finally, AP's challenge to NGA's Relevant Experience evaluation similarly fails.  The REET's evaluation of AP's Project 3-2 was neither irrational nor the product of disparate treatment and instead reflected a reasonable exercise of the Agency's discretion.[29]

As further explained previously, the CLOVER SOW included an illustrative list of capabilities for each WSC.  AR Tab 14a.1 at 1555–62.  As relevant to AP's challenges, the SBM WSC consisted of eight capabilities.  *Id.* at 1561–62.  These "provide[d] a generalized understanding of the type of work to be performed," *id.* at 1555, and were "not [] all-inclusive," *id.* at 1561.  Offerors were instructed "to provide enough substantiating documentation for the Government to evaluate and assess the technical capabilities contained in each relevant experience example."  AR Tab 17 at 2456.  The Solicitation indicated that scoring for Relevant Experience would be based on a scale assessing the degree to which each submission addressed the relevant WSC SOW capabilities.  *Id.* at 2469.  As material here, "Very Relevant" was defined as when an "[o]fferor submission addresses *most* aspects of the WSC, and convincingly demonstrates *that it will meet* the Government's performance requirements."  *Id.* (emphases added).  "Relevant" was defined as when an "[o]fferor submission addresses *some* aspects of the WSC, and convincingly

---

[29] AP and Exacta dispute the appropriate level of deference to afford to NGA's Relevant Experience evaluation.  *Compare* ECF No. 86 at 29 (Exacta emphasizing the "high level of deference" afforded to an agency's technical evaluations, "especially [] when a contract is for NGA, which is a Department of War combat support agency and a principal member of the U.S. intelligence community" (citing *Iron Bow Techs., LLC v. United States*, 132 Fed. Cl. 346, 359 (2017); and *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), *with* ECF No. 93 at 21–22 (AP arguing that *Iron Bow* did not "create a heightened standard of deference in armed forces procurements" and "the concerns cited in that case are not present here").  The Court need not resolve this dispute because AP has not established that the Agency's decision lacked a rational basis even under the general standard of deference to agency procurement decisions for which AP argues.  *See* ECF No. 93 at 21 (explaining that "the Court gives substantial deference to an agency's procurement decisions and evaluations, [though] that deference is not without limits" (citing *Eleit Tech., Inc. v. United States*, 179 Fed. Cl. 592, 601 (2026)).

demonstrates *a likelihood of meeting* the Government's performance requirements." *Id.* (emphases added).

AP submitted Project 3-2, involving [ . . . ]'s performance of Business Operations services for the [ . . . ], in support of the SBM WSC. *See* AR Tab 21b.36 at 3387. AP assigned itself a score of 3,000 points, reflecting a Very Relevant rating. *See* AR Tab 21e.4; AR Tab 17 at 2469. The REET, however, "determined that this self-score was not supported by [AP's] proposal submission and assessed the score as 2000 [or Relevant] based on the documentation submitted." AR Tab 98a at 44583.

AP challenges this evaluation on three bases, none of which are persuasive. First, AP argues that the Agency failed to explain why AP's Project 3-2 met only "some" aspects of the overall CLOVER SBM SOW (leading to a Relevant rating) rather than "most" aspects (which would have led to a Very Relevant rating). *See* ECF No. 64 at 33–35. Second, AP challenges NGA's determination that AP did not meet any of the CLOVER SBM Workforce Management requirements as unreasonable, insisting its proposal met at least "some" of the requirements. *Id.* at 35–40. Third, AP contends that the evaluators engaged in disparate treatment in conducting their evaluation. *Id.* at 40–41. The Court addresses each argument in turn.

> a.    *The Agency coherently and reasonably explained its evaluation of AP's Relevant Experience under Project 3-2 as Relevant rather than Very Relevant.*

Starting with AP's argument that the REET failed to reasonably explain why AP's Project 3-2 met only "some," rather than "most," aspects of the overall SBM SOW, the Court finds that the Agency's evaluation was coherently and reasonably explained.

AP's argument rests on a quantitative evaluation methodology that is inconsistent with NGA's discretion in assigning adjectival ratings under the RFP. AP contends that the CLOVER SBM SOW contained eight "requirements," which can be broken down into 30 "sub-

requirements." ECF No. 64 at 33; AR Tab 14a.1 at 1561–62. As the Government aptly points out, however, this list of "requirements" is instead an illustrative list of capabilities and, more importantly, does not contain any identified "sub-requirements." *See* ECF No. 79 at 83 (citing AR Tab 14a.1 at 1555). In analyzing what AP refers to as the eight SBM SOW "requirements," NGA found [ . . . ]'s referenced work demonstrated Very Relevant experience across three capabilities, Relevant experience across two capabilities, and Not Relevant experience across three capabilities. *See* AR Tab 98a at 44582–92. AP argues that it was entitled to an overall rating of Very Relevant, because "[w]hen broken down into sub-requirements, NGA found AP's submission met [16] of the [30] sub-requirements," which is more than half. ECF No. 64 at 34. Similar to its Past Performance argument then, AP seeks to convert the Solicitation's adjectival ratings into a quantitative analysis. As explained in evaluating Tellus's similar argument, *see supra* § III.A.1.a, the RFP did not provide for the quantitative evaluation methodology for which AP advocates.

Instead, the Solicitation afforded the evaluators discretion in making subjective determinations regarding the relevancy of an offeror's prior experience based on whether the experience addressed "most" or "some" aspects of the CLOVER SOW and whether the experience demonstrated that the offeror "will meet" the Government's performance requirements or just has "a likelihood of meeting" the Government's performance requirements. AR Tab 17 at 2469 (defining adjectival ratings); *see also* AR Tab 14b at 1715 (Q&A refusing to "quantitatively define 'some,'" and instead emphasizing that "[e]valuators will exercise their discretion," in assigning adjectival ratings); *Glenn Def. Marine*, 720 F.3d at 909 n.6 (explaining that adjectival ratings "are not subject to a mathematical calculation," and that evaluators instead "consider[] the adjectival ratings in light of the accompanying narrative comments" in exercising their discretion). In sum, AP's argument that the Agency was required to validate AP's score of Very Relevant for Project 3-2 merely because AP addressed a simple majority of "sub-requirements," *see* ECF No. 64 at 34,

94

rests on a flawed reading of the Solicitation's evaluation methodology. *See SOFITC3*, 178 Fed. Cl. at 208 (emphasizing that "[e]valuation of experience . . . , by its very nature, is subjective" (quoting *Gritter Francona*, 158 Fed. Cl. at 608)).

AP also challenges NGA's evaluation of Relevant Experience under Project 3-2 as inadequately documented. Namely, AP asserts that "the AR does not demonstrate a discernable path for how NGA determined that meeting [16] of the [30] sub-requirements on SBM warranted only a Relevant rating." ECF No. 64 at 35 (citing *RTD Middleburg Heights, LLC v. United States*, 172 Fed. Cl. 656, 668 (2024)). Setting aside the fact that this contention continues to rely on AP's erroneous understanding of the RFP's evaluation methodology, the Court finds the Agency's decisional path reasonably discernible. *See DynCorp*, 10 F.4th at 1313–14; *NARCORPS*, 177 Fed. Cl. at 547. As even AP acknowledges, *see* ECF No. 108 at 62:7–16, the REET conducted a thorough and detailed analysis of whether the referenced work addressed each of the eight illustrative capabilities contained in the CLOVER SBM SOW. *See, e.g.*, AR Tab 98a at 44583 (explaining that the "[r]eferenced work demonstrates very relevant experience supporting business process analysis"); *id.* at 44585 (concluding that "the referenced work is not similar in kind or scope to the tasks in the [CLOVER] SOW because it did not demonstrate []relevant experience recommending and facilitating implementation of techniques to change organizational behaviors that result in improved organizational performance"); *id.* at 44586 (comparing the Project 3-2 PWS with the CLOVER SOW and finding "[t]he tasks in the excerpt from the [ . . . ] PWS . . . are not similar to the communications described in the CLOVER SOW"). Thus, the Agency coherently and reasonably explained why AP's Project 3-2 PWS was either somewhat relevant, not relevant, or very relevant to each of the eight illustrative capabilities in the CLOVER SBM SOW. *See id.* at 44583–92.

AP argues that NGA did not explain how this underlying analysis resulted in an overall rating of Relevant. *See* ECF No. 64 at 35. Such an "explicit explanation is not necessary" because, again, the Court finds that the Agency's "decisional path is reasonably discernible." *DynCorp*, 10 F.4th at 1313–14 (quoting *Wheatland Tube*, 161 F.3d at 1369–70). NGA explained that it assigned a score of Relevant because AP "addresse[d] some aspects of the WSC, and convincingly demonstrate[d] a likelihood of meeting the Government's performance requirements." AR Tab 98a at 44583. Following this overall conclusion, the REET explained in detail why it found that, of the eight illustrative capabilities listed under the CLOVER SBM SOW, AP had demonstrated very relevant experience for three, some relevant experience for two, and not relevant experience for three. *See generally id.* at 44583–92. For example, the REET found that the "[p]rovided documentation does not demonstrate relevant experience" performing COOP activities because the potentially relevant section of the "[ . . . ] PWS . . . has nothing to do with COOP activities." *Id.* at 44587. NGA also noted that the "[r]eferenced work demonstrates very relevant experience supporting" Foreign Military Sales ("FMS") including by "[a]ssist[ing] the FMS financial management team with execution reviews covering status of funds." *Id.* The Agency also explained that the "[r]eferenced work demonstrates some relevant experience supporting communications," such as "strategic planning support to include analysis and advice on Missile Defense System (MDS) policy development," but that some of "[t]he tasks in the section from the [ . . . ] PWS . . . do not pertain to communications." *Id.* at 44585–86. Instead, the evaluators found that these "task[s] described in the [ . . . ] PWS relate[] to helpdesk support." *Id.* at 44586. Other examples abound. *E.g.*, *id.* at 44583 (explaining that AP demonstrated "very relevant experience supporting business process analysis" and listing several tasks within that capability where AP provided supporting documentation); *id.* (explaining that AP demonstrated "some relevant experience supporting organizational change management" and listing several tasks within that

capability where AP provided supporting documentation and several areas where AP did not); *id.* at 44588 (explaining that AP had "not demonstrate[d] relevant experience" for the security capability and explaining why the supporting documentation did not support tasks within this capability).

From this mix of findings, with AP addressing many, some, or none of the tasks within each illustrative capability, the Court can reasonably discern NGA's decisional path in determining, overall, that AP's proposal fell in the middle of the ratings scale—*i.e.*, it addressed "some" aspects of the SOW and "convincingly demonstrates a likelihood of meeting the Government's performance requirement." *See generally* AR Tab 98a at 44582–92; *see also* AR Tab 17 at 2469 (defining adjectival ratings ranging from "Very Relevant" to "Not Relevant" based on the degree to which the offeror submission addresses "most," "some," "few," or "not [] any" aspects of the WSC, and how likely it is the offeror "will meet the Government's performance requirements"). While AP may have preferred a more "explicit explanation," the Agency was not required to provide one. *DynCorp*, 10 F.4th at 1313–14 (quoting *Wheatland Tube*, 161 F.3d at 1369–70). The decisional path is clear, and it provided a "rational connection between" the underlying findings and NGA's decision to assign AP a Relevant rating. *NARCORPS*, 177 Fed. Cl. at 547 (quoting *State Farm*, 463 U.S. at 43).

        b.    *NGA coherently and reasonably explained its determination that AP's Project 3-2 did not demonstrate Relevant Experience performing SBM Workforce Management tasks.*

AP also argues that the Agency unreasonably determined that "none" of [ . . . ]'s work on Project 3-2 was relevant to the CLOVER SBM Workforce Management capability because, according to AP, the REET did not consider certain aspects of AP's submission. *See* ECF No. 64 at 35–40. Upon reviewing the Agency's evaluation, the Court concludes that NGA expressly considered most of the aspects of AP's submission that AP argues went unaddressed but simply

97

found that they did "not demonstrate relevant experience performing workforce management as described in the [CLOVER] SOW."  AR Tab 98a at 44589; *see also id.* at 44589–92 (providing further explanation for why certain tasks from the [ . . . ] PWS did not describe relevant Workforce Management tasks).  Insofar as the Agency did not expressly describe two of these aspects, the Court finds that AP did not include these aspects in its documentation index and that, in any event, AP would not have been prejudiced if NGA failed to consider them.

AP breaks the Workforce Management capability in the CLOVER SBM SOW into six "requirements":  (1) performance of forecasting and the analysis of workforce trends; (2) performance of manpower planning and advising the Government on requirements, policies, and implications of various courses of action; (3) assessment of manpower issues and providing reports for Government determinations; (4) recommendation of best practices for strategic workforce plans; (5) tracking status of personnel actions; and (6) performance of independent research and data collection tasks related to workforce planning in support of various measurements and objectives.  ECF No. 64 at 35–36; *see also* AR Tab 14a.1 at 1562 (CLOVER SOW description of Workforce Management).  While these were not identified as separate "requirements" under the CLOVER SOW, the Court adopts AP's framework for purposes of its analysis.  AP contends that the Agency failed to consider its supporting documentation for each of these six areas.

First, AP argues that [ . . . ]'s experience demonstrated performance forecasting and analyzing work trends because its Project 3-2 J.18 form stated that [ . . . ] "analysts track workforce requirements for each [ . . . ] program, conduc[t]ing analysis with each budget submission to determine any major changes in workforce requirements from the previous budget year."  AR Tab 21b.36 at 3388.  AP contends that this assertion "had ample support" in the Project 3-2 PWS, including: (1) "[a] description of the Strategic Planning and Financial Management performance

98

objective for all phases of the Planning, Programming, Budgeting and Execution ("PPBE") System, which required [ . . . ] to appropriately allocate and execute funds in multiple appropriations, review and analyze budget resources"; (2) "[a]ssisting with program office manpower reconciliations and preparing data for PPBE briefings and staffing requests"; and (3) "[o]perating, maintaining, and sustaining software applications and support user requirements for the PRIDE financial tool, which included a Workforce Integration Tracking System."  ECF No. 64 at 37 (citing AR Tab 21b.43 at 3420, 3430, 3446).

Contrary to AP's argument, the record demonstrates NGA considered these aspects of the Project 3-2 PWS but found that they were not relevant to the Workforce Management capabilities contemplated by the CLOVER SBM SOW.  AR Tab 98a at 44591.  As an example, the REET referenced the Project 3-2 PWS's discussion of "[t]he Strategic Planning and Financial Management performance objective [which] is required for core and matrix programs for all phases of the [PPBE] System," but concluded that these tasks were "different than workforce management tasks described in the CLOVER SOW."  *Id.* at 44590–91.  The evaluators also considered the PWS's discussion of "[s]upport includ[ing] requirements analysis, business process reengineering, solution design, testing, integration, workforce preparation, training, and operational support and sustainment," but again found that the excerpt "does not relate to workforce management" because it "relates to 'Financial Systems Initiatives, Integration, and Processes,' . . . not to 'forecasting and the analysis of workforce trends.'"  *Id.* (first quoting AR Tab 21b.43 at 3443; and then quoting AR Tab 14a.1 at 1562).  Thus, AP has not demonstrated that the Agency failed to consider its supporting documentation in evaluating its experience forecasting and analyzing work trends.

Second, AP maintains that [ . . . ] performed manpower planning and advised the Government on requirements, policies, and implications of various courses of action, citing the

99

portion of its J.18 form stating "[ . . . ] maintains fiscal controls for each budget, including tracking of the civilian and contractor workforce. [ . . . ] tracks civilian pay by program within the budget, and work[s] with the Comptroller and Director of Operations to ensure sufficient funding for the [ . . . ] workforce." AR Tab 21b.36 at 3388. AP argues that this is supported by the following elements of the Project 3-2 PWS: (1) "[m]aintain a historical tracking tool and metrics for the Agency's Career Development Program"; (2) "[a]ssist with DoD Financial Management Certification program administration, which is designed to ensure standardized competencies"; (3) "[a]id with program office manpower reconciliations and prepare data for PPBE briefings and staffing requests"; and (4) "[c]omply with an enterprise-wide contractor manpower reporting application." ECF No. 64 at 37 (citing AR Tab 21b.43 at 3428, 3430, 3455).

But NGA did consider the portion of the Project 3-2 PWS stating "[t]he core and matrix support provides uniformity of processes and consistency for [PPBE] activities," AR Tab 98a at 44589 (quoting AR Tab 21b.43 at 3419), and found this task was not a "workforce management task[]" or "similar to those described in the CLOVER SOW," *id.* at 44591. Likewise, the Agency considered that the Project 3-2 PWS discussed "support[ing] the DoD FM [Financial Management] Certification program and Career Development Program (CDP)," *id.* at 44590 (quoting AR Tab 21b.43 at 3420), but again found that these tasks were "different than workforce management tasks described in the CLOVER SOW," *id.* at 44591. Accordingly, AP has not established that the REET failed to consider aspects of the Project 3-2 PWS supporting AP's relevant experience performing manpower planning.

Third, AP contends that it demonstrated relevant experience in assessing manpower issues and providing reports for government determinations because it stated that [ . . . ] "work[s] with the Comptroller and Director of Operations to ensure sufficient funding for the [ . . . ] workforce." AR Tab 21b.36 at 3388. Additionally, "[ . . . ] recommended the development of a 'War Room'

approach that uses very experienced advanced analysts to conduct analysis on any issue assigned by senior [ . . . ] leadership."[30]  *Id.*  AP cites the following information from the Project 3-2 PWS to support this contention: (1) "[p]rovide executive level resource analysis to the Director for Operations and Comptroller/Chief Financial Officer organizations, analyze resource positions from various sources for strategic planning, integrate findings through communications with Agency programs and functionals, and submit results, including recommendations and Business Case Analyses"; (2) "[p]resent analysis on various alternatives to balance the budget across the Future Years Defense Program"; and (3) "[i]dentify program office resource related issues and present analysis that may include pros and cons at senior level meetings."  ECF No. 64 at 38 (citing AR Tab 21b.43 at 3426–27, 3430).

Yet the evaluators did consider, for example, the section of the Project 3-2 PWS stating that "[t]he Director for Operations (DO) is a functional organization that supports the [ . . . ] Executive Management Council (EMC), Program Executives, and Program Managers, to include multiple funding appropriations and Foreign Military Sales," AR Tab 98a at 44589 (quoting AR Tab 21b.43 at 3419), and found that this did not demonstrate a Workforce Management task, *id.* at 44591.  NGA also cited the PWS's discussion of "perform[ing] strategic planning, business case analysis and programming for Agency resources," *id.* at 44590 (quoting AR Tab 21b.43 at 3420), but found that these tasks are "different than workforce management tasks described in the CLOVER SOW," *id.* at 44591.  And the Agency considered that [ . . . ] "[a]ssist[ed] with budget drills and analysis," *id.* at 44590 (quoting AR Tab 21b.43 at 3448), but found that this "does not relate to workforce management" because "[t]he reference to 'resources' in that

---

[30] This particular reference was listed under the "Organizational Change Management" section of AP's Project Description, rather than the "Workforce Management" section.  *See* AR Tab 21b.36 at 3388.

section . . . appears to be to financial resources in general, not to personnel or workforce management," *id.* at 44591.  Overall, therefore, AP has not shown that the evaluators failed to consider aspects of the Project 3-2 PWS supporting AP's relevant experience in assessing manpower issues.

Fourth, AP argues it provided relevant experience recommending best practices for strategic workforce plans because its J.18 form indicated that "[ . . . ] analysts are involved in all aspects of PPBE planning support for [ . . . ], from the initial development of the strategic planning for the budget, drafting, and coordination of the budget guidance."[31]  ECF No. 64 at 38 (quoting AR Tab 21b.36 at 3388).  According to AP, this was supported by the following aspects of the Project 3-2 PWS: (1) "[s]trategic planning and financial management performance objective for all phases of the PPBE System," (2) "[d]evelopment of Program Objectives Memorandum [("POM")] and budget formulation materials," and (3) "[p]reparation of 1-n prioritized requirements lists and profiles for use in senior leadership decision forums."  *Id.* at 38–39 (citing AR Tab 21b.43 at 3420, 3435).  Once again, the REET did consider the Project 3-2 PWS's references to PPBE and POM but found that "[w]hile the excerpt . . . refers to a 'POM' . . . the tasks described in that section . . . are otherwise different than workforce management tasks described in the CLOVER SOW."  AR Tab 98a at 44590–91 (citing AR Tab 21b.43 at 3419).  Thus, AP has not established that NGA failed to consider aspects of the Project 3-2 PWS supporting AP's relevant experience recommending best practices for strategic workforce plans.

Fifth, AP contends that its Project 3-2 submission demonstrated relevant experience tracking the status of personnel actions because the PWS imposed "measurable performance standards," such as: "performance objectives with AQLs," "maintaining an internal tracking

---

[31] This particular reference was listed under the "Planning" section of AP's Project Description, rather than the "Workforce Management" section.  *See* AR Tab 21b.36 at 3388.

database using an agency-provided Excel-based software tool," and "quarterly self-assessments tied to performance metrics and contract performance." ECF No. 64 at 39 (citing AR Tab 21b.43 at 3425, 3436, 3455). AP does not cite any portion of its J.18 form in which it referenced these portions of the Project 3-2 PWS, and thus it cannot show that the Agency acted unreasonably by not providing an explicit explanation for why this experience was not substantiated by the supporting documentation. *See* AR Tab 17 at 2456 (indicating that the "completed [J.18] form should clearly index and identify the relevant experience that the Offeror is claiming"); *Warrior Focused Sols.*, 175 Fed. Cl. at 431 ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal." (quoting *CACI*, 158 Fed. Cl. at 19)). To the extent that NGA was required to consider these aspects of the proposal that AP did not reference in its J.18 form, AP could not establish that such an error was prejudicial. AP offers no reason why the Agency's consideration of these aspects would change its otherwise reasonable determination that AP did not address other aspects of the Workforce Management capability, let alone the Agency's overall Relevant Experience rating for Project 3-2. *See Info. Tech. & Applications*, 316 F.3d at 1319 (explaining that "[t]o establish prejudice, [a protester] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process" (quoting *Alfa Laval Separation*, 175 F.3d at 1367)).

Sixth, AP insists that [ . . . ] performed data collection related to workforce planning in support of various measurements and objectives because the Project 3-2 PWS "detailed direct workforce execution responsibilities, including: 50% staffing within 15 days, 100% staffing within 30 days, immediate clearance processing upon award, telework workforce accountability, and surge staffing capability." ECF No. 64 at 39 (citations omitted) (citing AR Tab 21b.43 at 3460–62). As with its supporting documentation for tracking personnel actions, AP did not address these

103

aspects in its J.18 form and, therefore, NGA reasonably did not explain why these aspects were unsupported by AP's submitted documentation.  *See* AR Tab 17 at 2456; *Warrior Focused Sols.*, 175 Fed. Cl. at 431.  Insofar as NGA unreasonably failed to consider these aspects, the Court cannot find prejudicial error because AP has not established that, but for the evaluators' alleged failure to consider these aspects, AP would have had a substantial chance of receiving award.  *Info. Tech. & Applications*, 316 F.3d at 1319.

In sum, the Court finds that the Agency properly considered AP's submission and coherently and reasonably explained its conclusion that Project 3-2 did not demonstrate relevant experience performing SBM Workforce Management tasks, as described in the CLOVER SOW.

        c.      *The Agency's evaluation of AP's Relevant Experience under Project 3-2 did not constitute disparate treatment.*

AP also alleges that the Agency engaged in disparate treatment in conducting its Relevant Experience evaluation of AP's Project 3-2.  *See* ECF No. 64 at 40–41.  Specifically, AP argues that the standardized J.18 template that offerors used to submit their Relevant Experience projects established an objective baseline requiring the evaluators to apply the same verification methodology across offerors.  ECF No. 93 at 23–25.  Despite this objective baseline, AP contends that NGA's analysis of AP's submission under Project 3-2 was more rigorous than that for other offerors.  *Id.*; ECF No. 64 at 40–41.  Because AP has not established that NGA "inconsistently applied objective solicitation requirements between it and other offerors," *Off. Design Grp.*, 951 F.3d at 1372, AP fails to demonstrate disparate treatment.

As an initial matter, the Court finds no support for AP's assertion that the standardized J.18 form established an objective baseline for evaluating and verifying offerors' self-scores for Relevant Experience.  Objective solicitation requirements include "proposal page limits, formatting requirements, or submission deadlines."  *Id.*  On the other hand, "[e]valuation of

experience, . . . by its very nature, is subjective." *SOFITC3*, 178 Fed. Cl. at 208 (quoting *Gritter Francona*, 158 Fed. Cl. at 608). The mere fact that the Solicitation instructed offerors to use a standardized form to submit their project information does not convert the inherently subjective evaluation of Relevant Experience into an objective requirement. *Cf. Frawner Corp. v. United States*, 161 Fed. Cl. 420, 454 (2022) (holding that the plaintiff failed to demonstrate disparate treatment in the agency's acceptance of a "nearly identical" form to the required PPQ because the plaintiff had not pointed to the agency's rejection of any similar form). Indeed, AP cites no support for its assertion that "[b]ecause each offeror was required to provide the same categories of information in the same format using the same fields, NGA established objective solicitation requirements and was required to apply the same verification methodology to each offeror using the J.18." ECF No. 93 at 24. Rather, the RFP required the Agency to evaluate offerors' Relevant Experience based on their supporting documentation, and the standardized J.18 form merely served to allow offerors to match up their supporting documentation to the relevant WSC capabilities. *See* AR Tab 17 at 2456 (explaining that the J.18 form "should clearly index and identify the relevant experience that the Offeror is claiming" and that "it is the responsibility of the Offeror to provide enough substantiating documentation for the Government to evaluate and assess the technical capabilities"). Accordingly, AP has not identified an objective solicitation requirement.

In any event, AP has not established that its Project 3-2 submission was subject to a more rigorous evaluation than other offerors. AP points out that the evaluators' analysis of AP's Relevant Experience under Project 3-2 spanned over nine pages, while the same analyses for Compass, Exacta, and Logic Gate each spanned less than three pages and those for ProCleared and Innovate Now were approximately three pages. *See* ECF No. 64 at 40 (citing AR Tab 98a at 44582–92; AR Tab 99a at 44670–73; AR Tab 102a at 44910–12; AR Tab 103a at 44989–92; AR

Tab 104a at 45081–83; AR Tab 105a at 45173–76).  This lengthier discussion, AP maintains, reflected a higher level of scrutiny which ultimately led to its lower rating.  *Id.*  For example, AP contends that the Agency accepted, what AP characterizes as, "generalized security references" in Logic Gate's proposal as "very relevant" while conducting a "line-by-line comparison of AP's submitted SOW to the CLOVER SOW."  *Id.* (citing AR Tab 98a at 44588–89; AR Tab 104a at 45083).

Yet, it is not at all clear that the lengthier analysis of AP's Project 3-2 resulted in the Agency assigning AP a lower Relevant Experience rating.  If anything, it appears that the additional discussion reflects an attempt by the REET to find further support for AP's self-score.  For example, the evaluators observed that AP "did not include any references to COOP experience in its supporting documentation index," but "[n]onetheless, the REET considered whether the PWS showed COOP tasks similar to those described in the [CLOVER] SOW."  AR Tab 98a at 44587.  Thus, AP has not established that the Agency engaged in disparate treatment in its evaluation of AP's Relevant Experience under Project 3-2.

Having reviewed AP's challenges to the REET's evaluation of AP's Project 3-2, the Court finds AP has not established that the evaluation was irrational, inadequately explained, or tainted by disparate treatment.

### D.    Tellus and AP Cannot Establish that NGA's HTRO Determination and Resulting Award Decision Were Unreasonable.

Finally, the Court must deny Tellus and AP's challenges to the Agency's overall HRTO determination and resulting award decision.  *See* ECF No. 62 at 7–8, 44; ECF No. 64 at 41 (citing *Octo Consulting Grp., Inc. v. United States*, 117 Fed. Cl. 334, 350 (2014)).  Given that the protesters' allegations fail to establish prejudicial error, and that neither party brings an

106

independent challenge to NGA's HTRO determination and resulting award decision, the Court finds that the Agency committed no error.

> **E.    Neither Tellus nor AP Can Establish Entitlement to Injunctive Relief.**

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case," (2) it "will suffer irreparable harm if the court withholds injunctive relief," (3) "the balance of hardships to the respective parties favors the grant of injunctive relief," and (4) "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). As Tellus and AP have not demonstrated that the Agency erred in its evaluation of their respective proposals, neither plaintiff has succeeded on the merits, and thus they are not entitled to permanent injunctive relief. *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 n.7 (Fed. Cir. 2022) (explaining that a court "need not address" the injunctive relief factors where the plaintiff "has not shown success on the merits"); *Glocoms, Inc. v. United States*, 149 Fed. Cl. 725, 734 (2020) ("[I]t is well-established that a plaintiff that has not succeeded upon the merits of its claims cannot prevail upon a request for injunctive relief.").

## IV.   CONCLUSION

For the foregoing reasons, the Motions for Judgment on the Administrative Record filed by Tellus (ECF No. 62) and AP (ECF No. 64), as well as Tellus's Motion to Supplement the Administrative Record with the Declaration of Sam Burton (ECF No. 61) are **DENIED**. Further, the Cross-Motions for Judgment on the Administrative Record filed by the Government (ECF No. 79), Compass (ECF No. 72), Logic Gate (ECF No. 73), ProCleared (ECF No. 81), Innovate Now (ECF Nos. 83, 84), and Exacta (ECF No. 86) are **GRANTED**. Lastly, the Government's Motion to Dismiss (ECF No. 79) is **DENIED AS MOOT** and Exacta's Motion to Dismiss (ECF No. 86) is **GRANTED IN PART AND DENIED IN PART AS MOOT**. The Clerk is directed to enter judgment accordingly.

Pursuant to RCFC Appendix C, ¶ 28, within seven days after the entry of final judgment, Defendant shall file with the Clerk the complete Administrative Record either via the Court's electronic-filing system or via a portable storage disc or drive.

**SO ORDERED**.


Dated: May 29, 2026                                   */s/ Kathryn C. Davis*
                                                       KATHRYN C. DAVIS
                                                       Judge